**UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **CASE NO: 3:21-CR-00440-M** |
| | ) | **FILED UNDER SEAL** |
| **RICHARD SPEIGHTS, JR. (3)** | ) | |

**<u>DEFENDANT'S MOTION TO QUASH INDICTMENT</u>**
**<u>AND DISQUALIFY PROSECUTION TEAM</u>**

i

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................... ii

TABLE OF AUTHORITIES ........................................................................................... iv

I.   Introduction ........................................................................................................ 1

II.  Background Facts ............................................................................................... 4

A.  The Government Recognizes its Obligation to Avoid Potentially Privileged Materials 6

B.  The Government's Conduct Gives Rise to a Strong Inference that the Prosecutor and Agents Directed Courville to Intentionally Extract Privileged Communications from Speights ................................................................................................... 8

1.  Government's Representations to the Court Conflict with the Discovery the Filter Team Produced ................................................................................... 10

2.  Prosecution Team Acquired Potentially Privileged Materials Before Speights Attorney Proffer ................................................................................... 11

3.  Prosecution Team Knew the Recordings Contained PPM in May 2021 ............. 16

4.  Prosecution Team Persistently Discussed the Contents of the Recordings .......... 18

5.  At Best, Prosecution Team Did Not Adequately Admonish Courville to Avoid Discussion of Potentially Privileged Materials .................................... 21

C.  Prosecution Team Relied Upon and Valued the Recordings ..................................... 23

III. Argument and Authority ..................................................................................... 25

A.  Privileged Disclosures ............................................................................. 26

1.  There Is No Unilateral Wavier Under the Joint-Client Doctrine ......................... 27

2.  No Privilege-Sharing Agreement Is Required to Invoke Non-Waiver Rule ........ 31

3.  Speights's Disclosures Did Not Waive Work Product Protections ..................... 33

4.  Specifically Designated Attorney-Client Privileged Disclosures in the Undercover Recording Transcripts ......................................................... 35

5.  Specifically Designated Work-Product Disclosures in the Undercover Recording Transcripts ......................................................................... 45

B.  Government Has Violated Speights's Fifth and Sixth Amendment Constitutional Rights ................................................................................................... 48

ii

1.  The Court Should Not Permit the Prosecution Team to Evade Sixth Amendment Scrutiny by Front-Loading Its Misdeeds ............................................................ 51

2.  Prosecution Team Intentionally Intruded Into Speights's Attorney Relationships ... 53

3.  Prosecution Team Prejudiced Speights Through Its Reliance Upon Potentially Privileged Materials .............................................................................................. 59

4.  Government's Intentional Invasion Into Speights's Attorney-Client Relationships Warrants Dismissal of the Indictment or at Least Replacement of the Prosecution Team .................................................................................................................... 61

IV. Conclusion ..................................................................................................................... 64

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Akins v. Sullivan*,
    574 F. App'x 454 (5th Cir. 2014) .......................................................................................31

*Akins v. Worley Catastrophe Response, LLC*,
    2013 WL 796095 ..................................................................................................30, 31

*In re Alexander*,
    580 S.W.3d 858 (Tex. App. 2019) ......................................................................................27

*Austin Lawyers Guild v. Securus Techs., Inc.*,
    No. 1:14-CV-366-LY, 2015 WL 11237655 (W.D. Tex. Mar. 23, 2015) ..............................59

*Black v. United States*,
    385 U.S. 26 (1966) ............................................................................................................49

*In re Crescent Res., LLC*,
    457 B.R. 506 (Bankr. W.D. Tex. 2011) .............................................................................30

*Crocker v. Durkin*,
    159 F. Supp. 2d 1258 (D. Kan. 2001) ...............................................................................63

*Ecuadorian Plaintiffs v. Chevron Corp.*,
    619 F.3d 373 (5th Cir. 2010) ............................................................................................35

*Elvis Presley Enters., Inc. v. City of Memphis*,
    2020 WL 4015476 (W.D. Tenn. July 16, 2020) .................................................................32

*In re Grand Jury Proceedings Jean Auclair*,
    961 F.2d 65 (5th Cir. 1992) ....................................................................................... *passim*

*In re Grand Jury Subpoena*,
    220 F.3d 406 (5th Cir. 2000) ............................................................................................34

*Guild v. Securus Techs., Inc.*,
    No. 1:14-CV-366-LY, 2015 WL 10818584 (W.D. Tex. Feb. 4, 2015) ................................59

*Hickman v. Taylor*,
    329 U.S. 495 (1947) (Jackson, J., concurring) ...................................................................34

*Hoffa v. United States*,
    385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966) ..........................................................49

*Ishee v. Fed. Nat. Mortg. Ass'n*,
   No. 2:13-CV-234-KS-MTP, 2014 WL 2162753 (S.D. Miss. May 23, 2014) ........................30

*In re LTV Sec. Litig.*,
   89 F.R.D. 595 (N.D. Tex. 1981) ...........................................................................32

*Luckenbach Texas, Inc. v. Engel*,
   No. 1:19-CV-00567-DH, 2022 WL 9530041 (W.D. Tex. Oct. 14, 2022).............................33

*Madison v. Vintage Petroleum, Inc.*,
   122 F.3d 1066 (5th Cir. 1997) ...........................................................................34

*Magnetar Techs. Corp. v. Six Flags Theme Park, Inc.*,
   886 F. Supp. 2d 466 (D. Del. 2012).....................................................................28

*Maine v. Moulton*,
   474 U.S. 159 (1985)...........................................................................6, 62, 65

*McCullough v. Fraternal Order of Police*,
   304 F.R.D. 232 (N.D. Ill. 2014).........................................................................28

*Mir v. L-3 Commc'ns Integrated Sys., L.P.*,
   315 F.R.D. 460 (N.D. Tex. 2016) ......................................................................34

*In re Mirant Corp.*,
   326 B.R. 646 (Bankr. N.D. Tex. 2005).................................................................28

*Parker v. Thaler*,
   No. 2:08-CV-245, 2011 WL 7090404 (N.D. Tex. Dec. 30, 2011) .................................50

*Perry v. Leeke*,
   488 U.S. 272, 109 S.Ct. 594, 102 L.Ed.2d 624 (1989)...........................................59

*Robert Bosch LLC v. Pylon Mfg. Corp.*,
   263 F.R.D. 142 (D. Del. 2009) .........................................................................28

*Rothgery v. Gillespie Cnty., Tex.*,
   554 U.S. 191 (2008).......................................................................................52

*S.E.C. v. Brady*,
   238 F.R.D. 429 (N.D. Tex. 2006) ......................................................................33

*Shields v. Sturm, Ruger & Co.*,
   864 F.2d 379 (5th Cir. 1989) ......................................................................34, 35

*Shillinger v. Haworth*,
    70 F.3d 1132 (10th Cir. 1995) ................................................................59

*In re Teleglobe*,
    493 F.3d 345 (3d Cir. 2007).................................................27, 28, 30, 32

*United States v. Beaulieu*,
    973 F.3d 354 (5th Cir. 2020) ................................................................62

*United States v. Bolden*,
    353 F.3d 870 (10th Cir. 2003) ..............................................................62

*United States v. Cox*,
    No. CRIM. 11-99 JLL 2012 WL 1986534, at *6 (D.N.J. June 4, 2012) ................................63

*United States v. Cronic*,
    466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984).....................................59, 60

*United States v. Daniels*,
    281 F.3d 168 (5th Cir. 2002) ................................................................63

*United States v. Fulmer*,
    722 F.2d 1192 (5th Cir. 1983) ..........................................................50, 62

*United States v. Haynes*,
    216 F.3d 789 (9th Cir.2000) ................................................................49

*United States v. Heldt*,
    668 F.2d 1238 (D.C.Cir.1981)..............................................................63

*United States v. Horn*,
    811 F. Supp. 739 (D.N.H. 1992), rev'd in part, 29 F.3d 754 (1st Cir. 1994)
    (rev'd in part on other grounds)..............................................................63

*United States v. Hungerford*,
    2019 WL 1903212 (E.D. La. Apr. 29, 2019).........................................25, 53, 62

*United States v. Irwin*,
    612 F.2d 1182 (9th Cir.1980) ................................................................49

*United States v. Johnson*,
    68 F.3d 899 (5th Cir. 1995) ................................................................50

*United States v. Johnson*,
    818 F. Supp. 1004 (S.D. Tex. 1993) ......................................................49

*United States v. Kahre*,
    737 F.3d 554 (9th Cir. 2013) ..................................................................................63

*United States v. Kennedy*,
    225 F.3d 1187 (10th Cir. 2000) ............................................................................51

*United States v. Lorenzo*,
    995 F.2d 1448 (9th Cir. 1993) ..............................................................................63

*United States v. Marshank*,
    777 F.Supp. 1507 (N.D. Cal. 1991) ..........................................................26, 53, 60

*United States v. Mastroianni*,
    749 F.2d 900 (1st Cir. 1984) ......................................................................26, 59

*United States v. Nolan-Cooper*,
    155 F.3d 221 (3d Cir. 1998)..................................................................................50

*United States v. Posner*,
    637 F. Supp. 456 (S.D. Fla. 1986) .......................................................................61

*United States v. Prantil*,
    764 F.2d 548 (9th Cir.1985) .................................................................................63

*United States v. Renzi*,
    722 F. Supp. 2d 1100 (D. Ariz. 2010) ................................................................49

*United States v. Russell*,
    411 U.S. 423 (1973)................................................................................50, 62

*United States v. Santana*,
    6 F.3d 1 (1st Cir.1993).........................................................................................50

*United States v. Segal*,
    313 F.Supp.2d 774 (N.D.Ill.2004) .......................................................................51

*United States v. Stein*,
    541 F.3d 130 (2d Cir. 2008).........................................................................52, 53

*United States v. Swenson*,
    894 F.3d 677 (5th Cir. 2018) ...............................................................................50

*United States v. Terzado-Madruga*,
    897 F.2d 1099 (11th Cir. 1990) ...........................................................................49

*United States v. Vega*,
    317 F. Supp. 2d 599 (D.V.I. 2004) ...................................................................63

*United States v. Voigt*,
    89 F.3d 1050 (3d Cir.), *cert. denied,* 519 U.S. 1047, 117 S.Ct. 623, 136
    L.Ed.2d 546 (1996) ..........................................................................50, 51, 61

*United States v. Williams*,
    No. 8:09CR457, 2011 WL 1058920 (D. Neb. Mar. 21, 2011), aff'd, 720 F.3d
    674 (8th Cir. 2013).........................................................................................51

*United States v. Zarzour*,
    432 F.2d 1 (5th Cir. 1970) ........................................................................49, 59

*Weatherford v. Bursey*,
    429 U.S. 545 (1977)............................................................................26, 49, 59

*Woodruff v. Davis*,
    No. 3:15-CV-1832-M, 2017 WL 5897534 (N.D. Tex. Nov. 30, 2017) (Lynn,
    J.)..............................................................................................................60, 63

*Young v. United States*,
    481 U.S. 787, 107 S.Ct. 2124, 95 L.Ed.2d 740 (1987)...................................63

**Other Authorities**

David M. Greenwald, et al., *Testimonial Privileges*, § 1.103 .......................................28

Fed. R. Evid. 502(d)......................................................................................... *passim*

Fed. R. Evid. 503(d)(5) .........................................................................................27

1 Paul R. Rice, *Attorney–Client Privilege in the United States* § 4.33 (2011) .............................32

*Restatement of The Law Governing Lawyers, Tentative Draft No. 2,* § 125,
    comments ..................................................................................................28, 29

*Restatement (Third) of the Law Governing Lawyers* § 75(1) (2000).......................................27, 28

*Restatement (Third) of the Law Governing Lawyers* § 76 (2000) .................................................32

Tex. R. Prof. Cond. 1.6(b) cmt 14 ...............................................................................27

Defendant Richard Speights (Defendant or "Speights") respectfully submits this brief in response to the Court's direction at the April 12, 2023 hearing and in support of his Motion to Quash the Indictment and Disqualify the Prosecution Team based upon outrageous and intentional misconduct by the government in which it deliberately and unlawfully used its confidential human source, Jim Courville ("Courville") to intrude into Speights's attorney-client privilege.

## I.    INTRODUCTION

Even the superficial and incomplete investigation by the Filter Team to date reveals that the Prosecution Team violated Speights's Fifth and Sixth Amendment rights by intentionally directing Courville to specifically elicit Speights's privileged legal advice for the purpose of acquiring information to undermine Speights's advice of counsel defense before he ever even had the opportunity to evaluate or assert such a defense. The Prosecution Team knew well and good that it had no right to use its confidential source to prospectively undermine Speights's advice of counsel defense.

The evidence suggests that the Prosecution Team intentionally directed Courville to pry into Speights's privileged conversations. Throughout the undercover recordings, Courville repeatedly and consistently asks Speights about what information their attorneys Sean McKenna and Keith Dugger knew and understood about the marketing arrangements at the heart of this indictment, and whether they would stand by the legal advice they had provided.

Courville's questions to Speights regarding privileged advice go to the heart of what the Prosecution Team knew was the primary impediment to prosecuting Speights—the formidable advice of counsel defense available to Speights in this case. While Courville's repeated

1

questioning of Speights on the subject, in phone call after recorded phone call and meeting after recorded meeting, alone suggests that this misconduct was at the direction of the Prosecution Team, many of the circumstances of the Prosecution Team's investigation make sense only if Courville elicited the privileged information at the Prosecution Team's direction. For example, on April 20, 2021, the Prosecution Team met with Courville to go over "what should be discussed with Speights" in the undercover calls,[1] and only hours after that meeting Courville records a conversation with Speights in which Courville almost immediately launched into questioning about what "did the attorneys know."[2] The only reasonable explanation for this timing is that Courville was following instructions.

A serious and unbiased inquiry into the Prosecution Team's misconduct would in all likelihood uncover even more explicit evidence of the instructions given to Courville. Unfortunately, the cursory investigation into its own colleagues that the Filter Team has conducted is inadequate and raises more questions than answers.[3] As set forth below, the Filter Team's investigation report is replete with self-serving and demonstrably false assertions from the Prosecution Team. These false statements are included in the Filter Team's March 3, 2023 Letter to this Court which it also attached to the Joint Status Report submitted to the Court on March 3, 2023 (the "Filter Team Letter"). As discussed more fully below, the records conclusively disprove a number of representations in the Filter Team Letter by establishing that:

---

[1] 04/20/2021 – 04/11/2021 Investigation Documentation form, at 1.
[2] Transcript 1124.001, 01:51:000-02:20:000 (Apr. 20, 2021).
[3] Given the inadequacy of the current investigation by the Filter Team and the admittedly awkward circumstances associated with the Filter Team investigating its own colleagues, Defendant requests that the Court consider assigning a special master to conduct a more thorough investigation into the Prosecution Team's misconduct.

- The Prosecution Team did, in fact, debrief with both Courville and Courville's attorney after the undercover dinner recording just before Speights's proffer, in contrast to the Filter Team's statement that they were not "aware of what was discussed" at that time;[4]

- The Prosecution Team reviewed the recordings, knew they contained privileged information, and "prepared written reports regarding recorded phone calls"[5] in May 2021, in contrast to the Filter Team's statement that TFO Wood "did not take notes of the content at that time"[6];

- The Prosecution Team received copies of the recordings in May 2021 and discussed their contents, in contrast to the Filter Team's claim that they lacked knowledge of the contents at that time;[7] and

- The Prosecution Team did not, as claimed, adequately instruct Courville "not to elicit privileged communications and, if they arose, to steer the conversation away from such communications."[8]

Critically, the government's intentional violation of Speights's privilege is not merely theoretical or hypothetical. As reflected in the prosecution memo forming the basis for the charges in the indictment, Courville's recordings and other information, including the privileged communications he extracted from Speights, at least in part formed the basis for the decision to prosecute Speights. In other words, we would likely not be here today absent the government's misconduct.

The evidence currently before the Court is more than sufficient to support a finding that the Prosecution Team violated Speights's Fifth and Sixth Amendment rights, and that disqualification of the Prosecution Team and dismissal of the indictment is warranted. But if the Court desires additional evidence to supplement the Government's investigation, the Court should

---

[4] Joint Status Report, Ex. B (ECF Doc. No. 120-2), at 6.
[5] Wood Activity Log (ECF Doc. No. 121-5), at 2.
[6] Joint Status Report, Ex. B (ECF Doc. No. 120-2)., at 4.
[7] *See id.*
[8] *Id.*

schedule an evidentiary hearing or engage a special master so that the defense and the Court may question the members of the Prosecution Team responsible for this conduct.

As a result of its gross and intentional misconduct, the Prosecution Team has unlawfully obtained and used Speights's privileged information to indict him and to prejudice his ability to defend himself or evaluate whether and when to assert an advice of counsel defense. The Court should not leave the government's violations of Speights's Fifth and Sixth Amendment rights without remedy. Accordingly, for the reasons below, the Court should disqualify the Prosecution Team and dismiss the indictment.

## II.    BACKGROUND FACTS

The present motion arises out of undercover recordings of conversations between Courville, acting as a confidential human source for the Government, and Speights, of which Speights had no knowledge until the Prosecution Team produced the recordings to him on January 30, 2023, one week after Speights entered a guilty plea before Magistrate Judge Toliver pursuant to a cooperation agreement.[9]  Upon even initial review, the recordings obviously reflected potentially attorney-client privileged communications that had been elicited from Speights by Courville. Specifically, the recordings revealed two types of protected information (1) attorney-client privileged information related to advice that Speights had received from counsel Shawn McKenna ("McKenna") and Keith Dugger ("Dugger"), who Speights had jointly retained along with Courville, Berbarian, and Defendants Grisham and Wilburn to provide legal advice regarding healthcare compliance and the business operations of the companies TCL and TCLMS, LLC, and (2) work product contained in an email from Speights's current legal counsel, Gene Besen, related

---

[9] *See* Feb. 3, 2023 Speights Letter to Judge Lynn (ECF Doc. No. 92).

to the preparation of Speights's legal defense.  Accordingly, Speights immediately contacted the Prosecution Team to address the issue and subsequently felt compelled to file his February 3, 2023 letter requesting that the Court hold his plea in abeyance only four days after receiving the recordings.[10]

After Speights filed his request for the Court to refrain from entering the plea, Speights made numerous attempts to work with both the Prosecution Team and the Filter Team to address this issue.  Initially, on February 9, 2023, the Prosecution Team indicated that, as a result of Speights's allegations of a constitutional violation, investigation would need to be conducted by the Filter Team, but on February 13, 2023, the Filter Team informed defense counsel that the constitutional issues were outside the Filter Team's purview because they were, at that point, merely privilege counsel.  Based on that conversation, Speights understands that no filter team had reviewed the undercover recordings before February 2023.  Eventually, by around February 14, 2023, the Filter Team began in earnest "gathering information" relating to the constitutional issues raised by Speights.

Since February, Speights has been in frequent contact with the Filter Team to gather necessary documents and records in order to investigate both the Prosecution Team's involvement in eliciting privileged information from Speights and the Prosecution Team's subsequent use of the privileged information that it successfully acquired.  Speights has also conferred with the Filter Team in a number of instances to discuss the portions of the undercover recordings that reveal attorney work product and attorney-client privileged information.

---

[10] *See id.*

Now, as discussed below, having reviewed the investigation records provided by the Filter Team along with all of the undercover recordings of which Speights is currently aware, it has become apparent that the Prosecution Team used Courville in order to violate Speights's constitutional rights and unlawfully access information that, even despite disclosure by Courville, remains privileged and protected by the work product doctrine. The Prosecution Team then used this ill-gotten information to indict Speights and to prejudice his ability to defend himself or evaluate whether and when to assert an advice of counsel defense.

**A.      The Government Recognizes its Obligation to Avoid Potentially Privileged Materials**

It is important to note at the outset that both the Prosecution Team and the Filter Team fully understand the importance of avoiding even inadvertent exposure to attorney-client privileged material, and "at the very least, the prosecutor and police have an affirmative obligation not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel." *Maine v. Moulton*, 474 U.S. 159, 171 (1985). As members of this Filter Team authored and explained in the DOJ Journal of Federal Law and Practice, courts "have become increasingly attuned to potential taint where members of the investigation or prosecution teams' access or review potentially privilege material" ("PPM").[11] "Where a prosecutor is deemed to have improperly accessed PPM, defendants are potentially entitled to significant remedies, ranging from evidentiary exclusion to disqualifying the prosecution teams and even dismissing the indictment."[12] The purpose of the Special Matters Unit (i.e., the Filter Team) "is to preserve defendants' legal privileges and ensure the Fraud Section prosecution teams are not tainted by

---

[11] The Special Matter Unit: Best Practices for Addressing Attorney-Client Privilege Issues, DOJ Journal of Federal Law and Practice, December 2022, at 30.
[12] *Id.*

6

exposure to privileged information."[13]  "A filter team may not be necessary in cases of express, intentional waiver. A filter team, however, is necessary to litigate the other exceptions to privilege."[14]

This Prosecution Team showed that it is equally aware of the Government's obligations to avoid potentially privileged materials in its February 8, 2023 filing to the Court, which explained that "[b]ecause the Prosecution Team became aware of references to attorneys on the recordings it requested a Filter Team take possession of them."[15]  The Prosecution Team's filing further explained that "[o]ut of an abundance of caution, . . . the Prosecution Team has been instructed not to review the material produced to Speights . . . ."[16]  Accordingly, the Prosecution Team's February 8, 2023 filing suggests that it recognized the importance of avoiding potentially privileged materials and implies that the Prosecution Team had not yet reviewed materials related to the recordings, even though this implication is patently false.[17]

Since the very beginning, the Prosecution Team understood its obligation to protect and avoid potentially privileged material, and it routinely sought to protect such information while interviewing Mr. Courville in advance of him becoming a confidential human source.  For example, one Report of Interview ("ROI") from 2020 contains multiple examples of the Prosecution Team demurring and ensuring it did not tread too closely, even inadvertently, to potentially privileged material:

---

[13] *Id*. at 30-31.
[14] *Id*. at 34.
[15] Feb. 8, 2023 Pros. Letter to Judge Lynn (ECF Doc. No. 101), at 2.
[16] *Id*.
[17] Notably, it is now clear that the Prosecution Team had reviewed the recordings a number of times over nearly two years and incorporated privileged communications into the prosecution memorandum used to justify the indictment.

- "To err on the side of caution, investigators did not ask specific questions about details of the meeting [with Sean McKenna] at Moxie's and Courville was not allowed to volunteer any details;"[18]

- "Courville stated this fact was common knowledge and discussed frequently between co-owners and attorneys however specific details of the conversations with attorneys was not shared"; [19] and

- "Courville was again asked not to provide specifics about what was discussed between attorney and others to avoid any claim of attorney client or common interest privilege."[20]

Clearly, the Prosecution Team understood the necessity of avoiding the attorney-client and common-interest privileges. Courville also would have learned and understood that the Prosecution Team is not allowed to hear about communications subject to attorney-client or common-interest privileges.

**B.     The Government's Conduct Gives Rise to a Strong Inference that the Prosecutor and Agents Directed Courville to Intentionally Extract Privileged Communications from Speights**

Despite the Prosecution Team's known responsibility to avoid potentially privileged information, the Prosecution Team failed to timely involve a filter team and repeatedly engaged in conduct that flagrantly disregarded Speights's privilege. For example, the events of April 20, 2021 are especially troubling because they can only reasonably be explained by the Prosecution Team's intentional and express directives to Courville to elicit from Speights clearly privileged information, including what, if anything, McKenna and Dugger understood about TCL's contracts with various marketers and what advice the five individuals operating TCL received from their counsel.

---

[18] Exhibit A, Investigation Documentation Form (4/30/2020 – 6/02/2020), TFO Wood, at 5.
[19] *Id.* at 8.
[20] *Id.* at 9.

On April 20, 2021, Trial Attorney López organized a meeting between TFO Wood, Trial Attorney López, Barret Howell, and Courville. At that meeting, TFO Wood provided Courville with a new recording device and instructed Courville regarding the topics that Courville should record Speights discussing. TFO Wood's Investigation Documentation Form makes clear that the Prosecution Team directed "what should be discussed with Speights."[21] TFO Wood also instructed Courville "how to brief each recorded conversation."[22]

That same day—*only hours after meeting with the Prosecution Team*—Courville called Speights and immediately (within two minutes) launched into a targeted sequence of questions about what the attorneys knew about TCL's marketing contracts:

| | |
|---|---|
| [01:51:000] MR. COURVILLE: | He's like, did the attorneys know that, y'all, like, is that the contracts that Grisham, that we signed, that Grisham signed from Hall Render, |
| [02:06:000] MR. COURVILLE: | and that we decided to pay a different way, or did they know that we were paying a percentage? |
| [02:14:000] MR. SPEIGHTS: | Man, I can't answer that. I mean, I'm assuming they knew we were paying the exact way we were paying. |
| [02:21:000] MR. COURVILLE: | Okay. |
| [02:22:000] MR. SPEIGHTS: | I mean, we did anything the lawyers didn't tell us not to do, I don't know that. I mean, I really don't. |
| [02:27:000] MR. COURVILLE: | Right, right. I just –[23] |

Minutes later in the same conversation, Courville questions Speights about whether McKenna and Dugger will stand behind the legal advice and guidance they have provided with respect to TCL:

[11:38:000] MR. COURVILLE:  I mean, but you think Hall Render is going to--

---

[21] Exhibit B, Investigation Documentation Form (04/20/2021 – 05/11/2021), TFO Wood, at 1.
[22] *Id.*
[23] Exhibit C, Transcript 1124.001 (Apr. 28, 2021), at [00:01:51-00:02:27].

[11:39:000] MR. COURVILLE:  I mean, we're going to sue them, but you think
they're going to stand by everything?

[11:42.000] MR. SPEIGHTS:    Last I heard, and that was months ago, but they
were standing by everything that they

[11:46.000] MR. SPEIGHTS:    advised us on.

[11:47:000] MR. COURVILLE:  And what about Sean?

[11:48:000] MR. SPEIGHTS:    I don't know about McKenna.[24]

The *only* reasonable explanation for this immediate direct line of questioning just after the

Prosecution Team that same day instructed Courville "what should be discussed with Speights" is

that Courville was following the express instructions of the Prosecution Team with respect to the

topics he pursued with Speights.[25]   Plainly, the Prosecution Team understood the largest

impediment to prosecuting this case was the Defendants' reliance upon legal advice from

McKenna and Dugger.  These events, in addition to others described below, show beyond cavil

that the Government took intentional steps to neutralize that defense before Speights even had the

opportunity to evaluate and assert it.

### 1. *Government's Representations to the Court Conflict with the Discovery the Filter Team Produced*

Unfortunately, the Government's response to Speights's concerns has been troublingly

inadequate.  The investigation records indicate that since the Filter Team became involved in early

---

[24] *Id.* at [00:11:38-00:11:48].

[25] In fact, TFO Wood's Activity Log reflects that the Prosecution Team was immediately aware of the fruits of their intentional covert foray into privileged material because TFO Wood "spoke on phone with confidential source after phone calls." Gov't Filter Team's *Ex Parte* and Sealed Motion for Entry of Order Pursuant to Fed. R. Evid. 502(d), Ex. 4 (ECF Doc. No. 121-5), at 2 [hereinafter Wood Activity Log (ECF Doc. No. 121-5)]. This also seemed to trigger a flurry of activity within the Prosecution Team, as TFO Wood and Trial Attorney López learn about the contents and developments of the call with Speights.  For example, throughout that day and evening of April 20, 2021, Trial Attorney López sent five text messages to Courville's attorney, all indicating that he was eager to connect with Courville's counsel. Exhibit D, López Texts with Howell, at 36-38.

10

February 2023, the Prosecution Team has met, amongst themselves, multiple times to get their stories straight. For example, TFO Wood's Activity Report reflects a February 6, 2023 meeting of just the Prosecution Team members where they specifically "discussed G. Beson [sic] motions/concerns."[26] According to TFO Wood's report, at least three other similar meetings of the Prosecution Team occurred in early February 2023.[27] However, despite the effort to get their stories straight, the factual narrative about Courville's activity as a CHS that was provided to the Filter Team, and subsequently reported to the Court, is incomplete, inaccurate, and inconsistent with the contemporaneous documents provided in discovery.

Specifically, the Filter Team provided a narrative of the investigation based on its conversations with the Prosecution Team in the form of a letter dated March 3, 2023, which it also attached to the Joint Status Report submitted to the Court on March 3, 2023 (the "Filter Team Letter").[28] The Filter Team Letter contains numerous representations regarding the conduct of the Prosecution Team that simply cannot be true in light of the documents the Filter Team provided to Speights in discovery. As discussed below, these untrue representations plainly result from an attempt to cover up conduct that the Prosecution Team knows was improper.

### 2.    *Prosecution Team Acquired Potentially Privileged Materials Before Speights Attorney Proffer*

The Filter Team Letter unequivocally—and falsely—states that "neither TFO Wood nor Trial Attorney López were aware of what was discussed during the April 28, 2021 [undercover] meeting prior to [Speights's] April 30, 2021 attorney proffer."[29] This representation would

---

[26] Wood Activity Log (ECF Doc. No. 121-5).
[27] *Id.* at 5 (Similar meetings occurred on February 6, 2023, February 8, 2023, and February 10, 2023.).
[28] Joint Status Report, Ex. B (ECF Doc. No. 120-2).
[29] *Id.* at 6.

indicate appropriate prosecutorial behavior if it were true.  It is unfortunately not true, as reflected in Trial Attorney López's April 28, 2021 evening text message to Courville's attorney, which states, "FYI – debriefed with Sgt Wood and JC [Jim Courville]. Talk tomorrow morning."[30]

In fact, the text messages and other documents prove that, contrary to the representations in the Filter Team Letter, both TFO Wood and Trial Attorney López fully understood the substance of Courville's April 28, 2021 undercover dinner meeting, debriefed with Courville immediately after the meeting, and took every opportunity to use Courville's undercover meeting to prepare for Speight's April 30, 2021 attorney proffer only two days later.  The Government's attempts to obscure these facts evidences that they know the Prosecution Team's conduct was inappropriate.

The Filter Team Letter provides three critical assertions regarding conduct and knowledge of both TFO Wood and Trial Attorney López with respect to the undercover dinner meeting that took place on April 28, 2021:

> (1) TFO Wood and Trial Attorney López "together drove with the CHS to and picked him up from the April 28, 2021" undercover meeting;[31]
>
> (2) TFO Wood and Trial Attorney López both "recall affirmatively telling the CHS not to discuss the substance of the meeting while driving him back" from the undercover meeting;[32] and
>
> (3) "neither TFO Wood nor Trial Attorney López were aware of what was discussed during the April 28, 2021 [undercover] meeting prior to your April 30, 2021 attorney proffer."[33]

---

[30] Ex. D (López Texts with Howell), at 43.  Defendant notes that this text message was only recently produced by the Filter Team on April 25, 2023.
[31] Joint Status Report, Ex. B (ECF Doc. No. 120-2), at 6.
[32] *Id.*
[33] *Id.*

The timeline of the April 28, 2021 undercover meeting stakeout is reflected in both TFO Wood's Investigation Documentation Form and TFO Wood's Activity Log. In TFO Wood's Investigation Documentation Form, TFO Wood recorded that TFO "Wood drove the cooperating source to" the location, then "remained in a location near the Stoneleigh Meridian Hotel and observed the cooperating source and Speights as they sat on a patio looking at a laptop together."[34] TFO Wood observed the undercover meeting until 9:33pm, when TFO "Wood met with the cooperating source and secured the covert recording device and *conducted a short debrief* of the cooperating source before departing."[35] TFO Wood's Activity Log also reflects that TFO Wood "provided [Courville] ride to meeting location, and provided cover during confidential meeting, picked up confidential source, secured recording device, and *conducted debrief*."[36]

However, both of TFO Wood's reports conspicuously omit any mention that the lead prosecutor of the investigation, Trial Attorney López, attended the entire stakeout to observe the undercover dinner meeting and to debrief Courville.[37] To be clear, it is an undisputed fact that TFO Wood and Trial Attorney López "together drove with the CHS to and picked him up from the April 28, 2021" undercover meeting.[38]

---

[34] Exhibit E, Investigation Documentation Form (04/28/2021 – 05/11/2021), TFO Wood, at 1. The laptop noted in TFO Wood's report corresponds to the portion of the undercover recording where Courville convinces Speights to work together reviewing and answering an email from Speights's counsel Gene Besen.

[35] *Id.* at 2 (emphasis added).

[36] Wood Activity Log (ECF Doc. No. 121-5), at 2 (emphasis added).

[37] *Cf.* Ex. E (Investigation Documentation Form (04/28/2021 – 05/11/2021)); Wood Activity Log (ECF Doc. No. 121-5), at 2.

[38] Joint Status Report, Ex. B (ECF Doc. No. 120-2), at 6. Notably, while the Government continues to contend these recordings were of no consequence or interest to the Prosecution Team, this meeting was important enough that the lead prosecutor deviated from DOJ Policy to join the agent for the stakeout.

It is also a fact that Trial Attorney López sent text messages to Courville's counsel which confirm a debrief occurred immediately following Courville's undercover dinner meeting. After the undercover meeting, Trial Attorney López and Courville's counsel had the following text message exchange, April 28, 2021 at 10:12 p.m.:

> Trial Attorney Lopez: "FYI – debriefed with Sgt Wood and JC. Talk tomorrow morning."
> Courville's Counsel: "WTF? Are you kidding me?"
> Trial Attorney Lopez: "Give me a call if your up."
> Courville's Counsel: "Still on with JC."
> Trial Attorney Lopez: "Alright I am up. Call me."
> Courville's Counsel: "Will Do."
> Trial Attorney Lopez: "I'll be up. To. Make sure you and I talk."
> . . .
> Courville's Counsel: "Wrapping up shortly. Sounds like tonight went well."[39]

Based on this text exchange, Trial Attorney López clearly did not, as he told the Filter Team, "affirmatively tell[] the CHS not to discuss the substance of the meeting while driving him back" from the undercover meeting.[40] The Filter Team Letter is incorrect or misinformed.

Upon examination at an evidentiary hearing, Trial Attorney López would have no choice but to concede (1) he had substantive discussions with both Courville and Courville's counsel regarding the April 28, 2021 dinner meeting; (2) that this debrief directly covered the substance of the undercover conversation; and (3) that he must have known and understood that a large portion of the evening's conversation was related to attorney-client communications and a work-product email sent from Speights's counsel to prepare for their forthcoming attorney proffer meeting with Trial Attorney López.

---

[39] Ex. D (López Texts with Howell), at 43-44.
[40] *See* Joint Status Report, Ex. B (ECF Doc. No. 120-2), at 6.

Trial Attorney López cannot credibly contend that he was anything other than fully aware of the substance of Courville's conversations with Speights, which were primarily tethered to defense strategy and work product of Speights' counsel as they prepared for the attorney proffer on April 30, 2021. In fact, the text exchange suggests that the Prosecution Team specifically sought Speights's defense strategy because Courville's counsel clearly believed that the Prosecution Team's objectives for the meeting were achieved.[41]

Trial Attorney López's text messages demonstrate a clear desire to access and discuss potentially privileged material in anticipation of Speights's April 30, 2021 attorney proffer. Not only did Trial Attorney López debrief with Courville two days before Speights's attorney proffer, Trial Attorney López waited up to ensure he could also debrief with Mr. Courville's counsel and discuss the undercover dinner meeting further.[42] Two days later, Trial Attorney López texts Courville's counsel in advance of the Speights attorney proffer asking Courville's counsel "I'll be meeting with GB [Gene Besen] for the next hour. I'll call you after. . . . Nothing I need to know before [Gene Besen] and I meet?"[43]

In sum, the Prosecution conducted a substantive debrief immediately following Mr. Courville's undercover dinner meeting with Speights and further debriefed with Courville's counsel. Given the undercover dinner's focus on responding to the email from Speight's counsel, the Prosecution Team clearly knew that the meeting and recordings were tainted by privileged information. Nevertheless, the Prosecution Team engaged no filter team. Instead, the Prosecution

---

[41] *See* Ex. D (López Texts with Howell), at 43-44.
[42] *Id.*
[43] *Id*. at 45.

15

Team sought the contents of the tainted meeting and any other insight into Speights's legal advice in anticipation of the attorney proffer on April 30, 2021.

### 3. *Prosecution Team Knew the Recordings Contained PPM in May 2021*

The Government has repeatedly played down the Prosecution Team's access to the recordings before November 2022, but the contemporary TFO Wood's Activity Log indicates that as early as May 10, 2021 he "began review of audio recordings, [had a] phone call with confidential source, [and had a] phone call with Federal Prosecutor."[44]  Further, in contrast to the Filter Team Letter's claim that "TFO Wood conducted what he described as a quick passthrough of the recordings, but to the Filter Team's knowledge, *he did not take notes of the content at that time*,"[45] TFO Wood's Activity Log indicates that he, in fact, spent at least five days from May 10, 2021 through May 18, 2021 "reviewing audio recordings and preparing written notes for report," "speaking with federal prosecutor," and "working on written reports regarding recorded phone calls."[46]  Notably, while neither the Filter Team nor the Prosecution Team have produced any such report from 2021, such a report likely exists and was circulated because it is referenced by no less than three contemporary investigative documents: (1)TFO Wood's Activities Log references the "written reports regarding recorded phone calls";[47] (2) TFO Wood's Investigation Documentation Form for 04/28/2021-05/11/2021 states "Sergeant Wood has since reviewed the recorded conversations . . . Wood will prepare a separate report summarizing the recorded conversations";[48] and (3) TFO Wood referenced the report in an email in November 2022 regarding the recordings,

---

[44] Wood Activity Log (ECF Doc. No. 121-5), at 2.
[45] Joint Status Report, Ex. B (ECF Doc. No. 120-2), at 6 (emphasis added).
[46] TFO Wood's Activity Log (ECF Doc. No. 121-5), at 2.
[47] *Id.*
[48] Ex. E (Investigation Documentation Form (04/28/2021 – 05/11/2021)), at 2.

where he stated "[j]ust FYI these were previously written about in a report I prepared months ago and the report and recordings were provided to your office."[49]

Further, the records indicate that TFO Wood repeatedly spoke to Trial Attorney López in May 2021 while TFO Wood was listening to the recordings and "travel[ing] to Dallas to deliver copies of recorded phone calls to Federal Prosecutor."[50]  TFO Wood listened to the audio recordings, spoke with Courville, and then called Trial Attorney López on May 10, 2021 and again on May 12, 2021.[51]

The Prosecution Team must have been aware of the potentially privileged nature of the recordings.  In fact, TFO Wood "recalls informing Trial Attorney Lopez by phone in or about this period, that based on his passing review, . . . Mr. Speights, while apparently *referring to a form intended for his attorney*, asked the CHS what he knew about several persons of interest in the investigation."[52]  TFO Wood clearly recognized and conveyed to Trial Attorney López that the recordings contain potentially privileged material.  TFO Wood has even described in subsequent handwritten notes that, in the recordings, "they are look at stuff on laptop[.] list of names & questions provided by Beason [sic]."[53]  One such person mentioned only as a result of the email from Speights's attorney was Mark Levy, who ended up specifically referenced in the Prosecution

---

[49] Gov't Filter Team's *Ex Parte* and Sealed Motion for Entry of Order Pursuant to Fed. R. Evid. 502(d), Ex. 5 (ECF Doc. No. 121-6), at 2 [hereinafter Nov. 21, 2022 Email from Wood to Scheiss (ECF Doc. No. 121-6)].

[50] Wood Activity Log (ECF Doc. No. 121-5), at 2.

[51] *Id.*

[52] Joint Status Report, Ex. B (ECF Doc. No. 120-2), at 6 (emphasis added).

[53] Gov't Filter Team's *Ex Parte* and Sealed Motion for Entry of Order Pursuant to Fed. R. Evid. 502(d), Ex. 8 (ECF Doc. No. 121-9), at 10 [hereinafter Wood's Handwritten Notes (ECF Doc. No. 121-9)].

memorandum[54] despite his name only arising from the work-product email from Speights's legal counsel.  Courville, who claims in the recording to not know who Mark Levy is at all, ends up testifying in the grand jury that Speights introduced Future Care, Mark Levy's company, to TCL.  Courville could only have known this is as a result of the April 28, 2021 undercover meeting.

The Prosecution Team clearly knew of the potentially privileged materials in the recordings in May 2021.  They did not engage a filter team to review those materials for another two years.  Instead, the Prosecution Team considered and relied on the Recordings' PPM to build a case against Speights, prepare the Prosecution memorandum, and indict Speights.

### 4.    *Prosecution Team Persistently Discussed the Contents of the Recordings*

Conveniently, Trial Attorney López indicated to the Filter Team that he does not remember any of the conversations about the recordings that he had from March through May of 2021, despite the multiple calls with TFO Wood regarding the recordings and the numerous contemporaneous conversations between himself and Courville's counsel.[55]  Trial Attorney López also indicated that he does not recall receiving the discs containing either the first or second set of recordings from TFO Wood or from Agent Shaw,[56] even though contemporaneous records establish that the copies of the recordings were "retained as working copies for Sergeant Wood and the Federal Prosecutor" on May 11, 2021[57] and TFO Wood gave those copies to Trial Attorney López on May 13, 2021.[58]  Likewise, the Filter Team Letter states that "the recordings did not inform any subsequent

---

[54] Gov't Filter Team's *Ex Parte* and Sealed Motion for Entry of Order Pursuant to Fed. R. Evid. 502(d), Ex. 6 (ECF Doc. No. 121-7), at 12 [hereinafter Prosecution Memo (ECF Doc. No. 121-7)].
[55] *See* Joint Status Report, Ex. B (ECF Doc. No. 120-2), at 6.
[56] *See id.*
[57] Ex. E (Investigation Documentation Form (04/28/2021 – 05/11/2021)), at 2.
[58] Wood Activity Log (ECF Doc. No. 121-5), at 2.

investigative action taken by the Prosecution Team with respect to Mr. Speights (or anyone else)"[59] notwithstanding the fact that the Prosecution Team included the recordings and PPM in its own section of the Prosecution Memo supporting Speights's indictment.[60]  In reality, the Prosecution Team had substantive debriefs with Courville following the April 28, 2021 undercover meeting and engaged in nearly daily efforts to discuss the same with Courville's counsel.  The Government is not credible when it represents to the Court that the recordings contained nothing of interest and that Trial Attorney López does not remember anything about the recordings.

       Contrary to the representations of the Filter Team Letter, Trial Attorney López knew of the contents of the recordings from the first recording device, received the discs of the recordings, and discussed the same with the Prosecution Team and his supervisor.  Text messages between Special Agent Shaw and Trial Attorney López reflect multiple conversations about the recordings whereby Special Agent Shaw actively kept Trial Attorney López abreast of how the undercover operation was developing.[61] On February 17, 2021, only six days after Courville became a confidential human source with the codename "Silver," Special Agent Shaw lets the lead prosecutor know that Silver "had a productive call" and the further text messages reflect efforts for a further telephone call to discuss.[62]

       The Prosecution Team's text messages also reveal that by March 25, 2021 Trial Attorney López and TFO Wood had engaged in substantive discussions about the recorded calls between

---

[59] *See* Joint Status Report, Ex. B (ECF Doc. No. 120-2), at 7.

[60] Prosecution Memo (ECF Doc. No. 121-7), at 12.

[61] Gov't Filter Team's Second *Ex Parte* and Sealed Motion for Entry of Order Pursuant to Fed. R. Evid. 502(d), Ex. 15 (ECF Doc. No. 126-2), at 5 [hereinafter López Text Messages with Shaw (ECF Doc. No. 126-2)] (February 17, 2021 update to Trial Attorney López regarding Courville's "productive call").

[62] *Id.*

Courville and Speights.  On March 24, 2021, for example, Trial Attorney López organized a meeting with TFO Wood for the express purpose of "discuss[ing] Courville and Speights Recordings."[63]  Such a discussion would necessarily require at least some familiarity with the contents of the recordings.  In fact, following the March 25, 2021 discussion of the recordings, Special Agent Shaw indicates that she "[has] the recordings on CD" and offers to "run a CD to [Trial Attorney López] and [TFO Wood] to listen back at [their] office" because "[t]hat will help [them] assess any further action."[64]  Trial Attorney López agrees and replies "[t]hat makes sense!," indicating that he agrees and intends to listen to the recordings.[65]  A few days later on March 31, 2021, Special Agent Shaw delivered the recordings to Trial Attorney López's apartment.[66]

Ultimately, after discussing the recordings with Agent Shaw and TFO Wood, Trial Attorney López's text messages indicated that he also discussed the recordings with his supervisor, the head of DOJ's Healthcare Fraud Strikeforce in Texas, Adrienne Frazier, on April 5, 2021.[67]  Following the discussion of the recordings with his supervisor, Trial Attorney López again sought to discuss the recordings with Agent Shaw and TFO Wood, if he "had a chance to listen to the recording."[68]

---

[63] Gov't Filter Team's Second *Ex Parte* and Sealed Motion for Entry of Order Pursuant to Fed. R. Evid. 502(d), Ex. 1 (ECF Doc. No. 126-3), at 2 [hereinafter López Text Messages with Wood (ECF Doc. No. 126-3)].

[64] López Text Messages with Shaw (ECF Doc. No. 126-2), at 15.

[65] *Id.*

[66] *Id.* at 18 (Agent Shaw states "Let do hand off early morning. . . . Here.   Parked in front of leasing office.").

[67] *Id.* at 20 ("I spoke with Adrienne and want to fill you in.").

[68] *Id.* at 20.

20

The contemporary records show that the Prosecution Team persistently discussed the recordings and their contents throughout March, April, and May of 2021. The contentions in the Filter Team Letter that Trial Attorney López lacked knowledge of the contents of the recordings and that the Prosecution Team believed the recordings "contained nothing of interest" can only be seen as attempts to obfuscate the actual investigative misconduct and conceal the Prosecution Team's efforts to intentionally work through the attorney-client privilege—its primary impediment to indictment.

### 5.    *At Best, Prosecution Team Did Not Adequately Admonish Courville to Avoid Discussion of Potentially Privileged Materials*

The Prosecution Team provided no written instruction to avoid potentially privileged materials, and the contemporary investigation records contain no indication that Courville ever received any instruction, either verbal or written, to avoid potentially privileged materials.[69] The only record of any such admonishment comes from the Filter Team Letter's 2023 assertion that Trial Attorney López "admonished the CHS not to elicit privileged communications and, if they arose, to steer the conversation away from such communications" on two occasions—during the February 11, 2021 meeting initiating Courville as a confidential human source, and on April 28, 2021 in advance of the undercover meeting.[70] Considering that Courville actively cooperated with

---

[69] Not even the Investigation Document Forms reference any admonition given to Courville in recoding conversations with Speights, which contrasts starkly with TFO Wood's other reports that reflect clear instructions to avoid privileged information. *Cf.* Ex. B (Investigation Documentation Form (04/20/2021 – 05/11/2021)) & Ex. E (Investigation Documentation Form (04/28/2021 – 05/11/2021)), (both instructing Courville to record conversations with Speights but containing no reference to potentially privileged materials) *with* Ex. A (Investigation Documentation Form (4/30/2020 – 6/02/2020)), ("Courville was again asked not to provide specifics about what was discussed between attorneys and others to avoid any claim of attorney client or common interests privilege."). This point is further discussed below regarding the Prosecution Team's intentional intrusion into Speights's attorney-client relationships.

[70] *See* Joint Status Report, Ex. B (ECF Doc. No. 120-2), at 4.

the Prosecution Team in hopes of avoiding indictment, the Court should presume that Courville anxiously and diligently followed all of the instructions he received from the Prosecution Team.

Nevertheless, the recordings reflect that, if any was actually given, the admonishment from the Prosecution Team was troublingly inadequate because Courville repeatedly over a period of months targeted and sought advice Speights received from counsel.  In fact, in the April 28, 2021 recording taken immediately after "Trial Attorney Lopez again verbally admonished the CHS in person not to elicit privileged communications and, if they arose, to steer the conversation away from such communications,"[71] one of the first conversations brought up was the meeting Speights had with his attorney that day, to which Courville responded "well I'm anxious to hear."[72]  That same recording contains numerous instances of Courville pressing Speights to reveal what Speights's current and former lawyers have told him.[73]  At one point in the recording, in order to encourage Speights to talk about legal advice, Courville even jokes with Speights about not understanding attorney-client privilege, saying "[y]eah – I don't understand the privilege.  . . . They asked me about it and I was – like – [Inaudible]" and then laughing.[74]  After that, when Speights says he cannot answer an emailed list of questions from his attorney, Courville refuses to steer the conversation away, and instead states "we can answer right now.  Shit – let's knock it out."[75]  This conversation occurred the same day that the Prosecution Team purportedly admonished Courville and after months of Courville recording conversations with Speights where

---

[71] *Id.* Importantly, as addressed below, the Filter Team Letter does not even suggest that Courville was admonished to stay away from attorney-client communications during the April 20, 2021 meeting and subsequent recording of Speights on that same day.

[72] Exhibit F, Transcript 0416.002 (Apr. 28, 2021), at [00:07:56].

[73] Ex. F (Apr. 28, 2021 Transcript).

[74] *Id*. at [00:20:23-00:20:45].

[75] Exhibit G, Transcript 0416.003 (Apr. 28, 2021), at [00:18:00].

he continually references his own lawyer to encourage Speights, asks Speights about TCL's lawyers,[76] and asks Speights about his conversations with his own counsel regarding his own defense.[77]

The Prosecution Team either did not actually admonish Courville or the admonitions were completely ineffective and troublingly inadequate. At an evidentiary hearing, cross examination of the Prosecution Team could very likely reveal that Courville was not in fact admonished to avoid potentially privileged materials, in direct contrast to the representations that the Filter Team Letter made to the Court.

## C.    Prosecution Team Relied Upon and Valued the Recordings

After the recording devices containing the April 20, 2021 call and the April 28, 2021 dinner meeting were returned and processed, TFO Wood immediately began reviewing the recordings. As reflected in his Activity Log, TFO Wood regularly traveled to Dallas and communicated with

---

[76] *See* Ex. C (Apr. 20, 2021 Transcript), at [00:02:14-00:02:21] ("I'm assuming the [attorneys] knew we were paying the exact way we were paying."), [00:05:53-00:06:10] ("Whatever we were doing, as it related to Matt, Hall & Render was approved at every step of the way."), [00:07:45-00:07:55] ("[Hall & Render] know everything he [Matt Eggan] was doing. At the end of the day, and Matt even changed a couple of things, they wanted him to change. So everything they wanted, Matt did. So, and we did."); Exhibit H, Transcript 1124.003 (Feb. 14, 2021), at [00:16:39-00:17:09] ("He met with ARK in Dallas with Sean McKenna...I was not in that meeting...Sean came out and said, you know – out of everybody's program, I like theirs the best."), [00:17:42-00:17:49] ("They didn't say – well you shouldn't do this or – they said I can do it. As a matter of fact – they wrote the fucking program and the contract – knew exactly what the fuck we were doing."); Exhibit I, Transcript 0416.006 (Apr. 28, 2021), at [00:42:19-00:42:35] ("Because Sean McKenna and {inaudible} [Hall Render] said – pay the percentage and its okay until we can get fair market value from this company. They signed off on that – and that's fact.").

[77] *See* Ex. H (Feb. 14, 2021 Transcript), at [00:04:42-00:05:05] ("heard anything [from Gene Besen]?"); Ex. E (Apr. 28, 2021 Transcript), at [00:31:43-00:31:52] ("Dude, I just want you to call me tomorrow [after Speights's planned meeting with the undersigned defense counsel] and tell me that everything is going to be fucking ok."); Exhibit J, Transcript 0416.005 (Apr. 28, 2021), at [00:09:10-00:09:30] ("So, have you and Gene planned this meeting, or is this meeting out of the blue? . . . This isn't something that he called 911 we have got to meet?").

Trial Attorney López and Courville while reviewing the recordings in May 2021.[78] It is clear that the recordings warranted multiple conversations with Courville and Trial Attorney López.

In the fall of 2022, as the Prosecution Team prepared to indict Speights, TFO Wood again listened to the recording, and took handwritten notes that, among other things, clearly portray his understanding that the recordings contain potentially privileged material and even highlight the discussion of a "list of names & questions provided by Beason [sic]."[79]  As TFO Wood reviewed the recordings he reported to Trial Attorney Hirsh that the recordings contain numerous references that Speights "RELIED ON LAWYERS."[80]  More importantly, as noted by TFO Wood on November 21, 2022, the Prosecution Team clearly believed the recordings were important and that Lee Hirsch from the Prosecution Team "needed to listen to certain parts of the recordings . . . [and] it was being sent a second time was so that [Hirsch] could get them quick and work on the indictment and prosecution memo."[81]  TFO Wood eventually sent both Trial Attorneys a typed summary of the undercover dinner meeting recordings that plainly reflects the potentially privileged subject of the conversation with Speights.[82]

Ultimately, the Prosecution memorandum submitted to obtain authorization to present this case to the grand jury contains a section that outlines the proceeds of the Prosecution Team's covert

---

[78] Wood Activity Log (ECF Doc. No. 121-5), at 2.
[79] Wood's Handwritten Notes (ECF Doc. No. 121-9), at 10.
[80] Gov't Filter Team's *Ex Parte* and Sealed Motion for Entry of Order Pursuant to Fed. R. Evid. 502(d), Ex. 9 (ECF Doc. No. 121-10) [hereinafter Hirsch Notes (ECF Doc. No. 121-10)].
[81] Nov. 21, 2022 Email from Wood to Scheiss (ECF Doc. No. 121-6).
[82] Gov't Filter Team's *Ex Parte* and Sealed Motion for Entry of Order Pursuant to Fed. R. Evid. 502(d), Ex. 7 (ECF Doc. No. 121-8) [hereinafter Wood Dinner Summary (ECF Doc. No. 121-8)].

recordings of Speights—including a critical bullet erroneously stating that Speights admitted to misleading McKenna and Dugger.[83]

While the Government now argues that the "recordings did not inform any subsequent investigative action,"[84] it is important to note that in 2022 Trial Attorney Hirsch considered the recordings important enough to the prosecution to designate an entire section in the Prosecution memorandum to the recordings and to include a quote from the recordings in the email transmitting the final version of the indictment and prosecution memorandum.[85]

This Prosecution Team must concede that it relied on the recordings to, among other things, negate advice of counsel and allegedly implicate the legal advice with the crime-fraud exception to privilege – an argument they plainly raised the prosecution memorandum.[86]

This is the actual, intentional purpose of the Prosecution Teams efforts with Courville.  The Prosecution Team utilized Courville to gain an improper strategic advantage to either negate the advice of counsel defense or otherwise figure out a way around it, i.e., utilizing these recordings to establish a crime-fraud exception to the privilege.

### III.    ARGUMENT AND AUTHORITY

Government misconduct that intrudes into a defendant's relationship with his attorney may implicate violations of both the Fifth Amendment right to due process and the Sixth Amendment rights to counsel.  *See United States v. Hungerford*, 2019 WL 1903212, at *10 (E.D. La. Apr. 29, 2019) ("Depending on when it occurs, government misconduct which subverts a defendant's

---

[83] Prosecution Memo (ECF Doc. No. 121-7); Gov't Filter Team's Second *Ex Parte* and Sealed Motion for Entry of Order Pursuant to Fed. R. Evid. 502(d), Ex. 1 (ECF Doc. No. 126-4) [hereinafter Nov. 20, 2022 Hirsch Email (ECF Doc. No. 126-4)].
[84] *See* Joint Status Report, Ex. B (ECF Doc. No. 120-2), at 7.
[85] Nov. 20, 2022 Hirsch Email (ECF Doc. No. 126-4).
[86] Prosecution Memo (ECF Doc. No. 121-7), at 14.

relationship with his [attorney] may be judged under standards of both Fifth and Sixth Amendments.") (quoting *United States v. Marshank*, 777 F.Supp. 1507, 1518 (N.D. Cal. 1991)). Further, as courts have recognized, governmental possession of attorney-client privileged "information is inherently detrimental, unfairly advantages the prosecution, and threatens to subvert the adversary system of criminal justice." *United States v. Mastroianni*, 749 F.2d 900, 907-08 (1st Cir. 1984) (citing *Weatherford v. Bursey,* 429 U.S. 545, 556 (1977)).

Here, the undercover recordings that Courville made at the instruction of the Prosecution Team contain specific conversations that reveal attorney-client privileged information and work-product materials that Courville improperly coaxed Speights to disclose.  Because the Prosecution Team intentionally acquired the protected information, has been in possession of the protected information for years, and used the protected information to prejudice Speights by subverting his attorney-client relationships, Speights's constitutional rights have been violated.

## A.    Privileged Disclosures

The Prosecution Team exploited Courville to invade and extract Speights's confidential, privileged, and otherwise protected legal strategies and theories to guide its pursuit of an indictment.  The statements that Courville extracted include Speights's lawyers' confidential statements revealing their legal advice and legal strategies regarding regulatory compliance to avoid civil or criminal adversary proceedings.  Speights's disclosure of these privileged and work-product protected communications, however, did not constitute waiver of any protections that would allow the government—particularly without a pre-review court order—to utilize the statements against Speights.  *First*, these lawyers represented Courville and Speights, individually and through their single-member entities, as co-clients, and one co-client (Courville) cannot as a matter of law waive the privilege protections enjoyed by another co-client (Speights).  *Second*,

26

even if Courville was simply a third party, Speights's disclosure of protected information to him did not waive the work-product protection because Courville was not a known adversary (he was a confidential informant) and had no reasonable belief that disclosing protected information to him would substantially increase the chances of disclosure to an adversary.

1.    *There Is No Unilateral Wavier Under the Joint-Client Doctrine*

Texas recognizes that, absent a conflict of interest and upon informed consent, a single lawyer may represent multiple clients on a matter involving a common legal interest. *In re Alexander*, 580 S.W.3d 858, 865 (Tex. App.—Houston [14th Dist.] 2019, no pet.) ("Joint representation is permitted when all clients consent and there is no substantial risk that the lawyer's representation of one client would be materially adversely affected by the lawyer's duties to the other.") (citing 2 Restatement (Third) of the Law Governing Lawyers § 128 (2000)). The Texas Rules of Professional Conduct permit joint representation if the jointly retained attorney has no concurrent conflict of interest or, if a concurrent conflict of interest exists, the lawyer reasonably believes that she is able to provide competent and diligent representation to each client and the clients provide informed consent. *See* Tex. R. Prof. Cond. 1.6(b) cmt. 14 (noting that a lawyer's "common representation may be permissible where the clients are generally aligned in interest even though there is some difference of interest among them"). In this co-client or joint-client situation, the attorney–client privilege protects from compelled disclosure communications between one or more of the co-clients and their common lawyer. *In re Teleglobe*, 493 F.3d 345, 366 (3d Cir. 2007); *In re Grand Jury Proceedings Jean Auclair*, 961 F.2d 65 (5th Cir. 1992); *see also* Tex. R. Evid. 503(d)(5) (providing privilege exception in joint-client setting when two joint clients later become adverse); *Restatement (Third) of the Law Governing Lawyers* § 75(1) & (2) (2000).

27

Under federal common law, the joint-client doctrine applies when one lawyer, set of lawyers, or law firm represents two or more clients regarding a matter of common legal interest. The joint-client doctrine protects the clients' otherwise privileged communications with their common attorney from compelled disclosure from persons outside the joint representation. *In re Teleglobe*, 493 F.3d 345, 366 (3d Cir. 2007); *McCullough v. Fraternal Order of Police*, 304 F.R.D. 232, 237–38 (N.D. Ill. 2014); *Magnetar Techs. Corp. v. Six Flags Theme Park, Inc.*, 886 F. Supp. 2d 466, 479 (D. Del. 2012); *Restatement (Third) of the Law Governing Lawyers* § 75(1) (2000); David M. Greenwald, et al., *Testimonial Privileges*, § 1.103. The doctrine does not protect from disclosure of the clients' communications with their common attorney when they become adverse. *Teleglobe*, 493 F.3d at 366; *In re Mirant Corp.*, 326 B.R. 646, 649 (Bankr. N.D. Tex. 2005); Greenwald, *supra*, § 1.103. And the doctrine does not protect the clients' communications with their lawyer when one or more of them institute an adversary proceeding against their common counsel. A party in a joint-client representation may unilaterally waive the privilege over its communications with the joint attorney so long as the disclosure concerns **only the waiving party's communications**. Otherwise, third parties may not obtain communications made in a joint-client relationship unless all joint clients consent to waive the privilege. *Teleglobe*, 493 F.3d at 363; *Robert Bosch LLC v. Pylon Mfg. Corp.*, 263 F.R.D. 142, 145–46 (D. Del. 2009); *Restatement (Third) of the Law Governing Lawyers* §75(1) (2000).

The Fifth Circuit's decision in *In re Grand Jury Proceedings Jean Auclair*, 961 F.2d 65 (5th Cir. 1992), is instructive. In *Auclair*, subjects of a criminal investigation, Victor Feazell, Diane Sanders, and Mike Sanders consulted a lawyer (Burton) about joint representation in response to a grand jury subpoena served upon Diane Sanders. *Id.* at 66. Lawyer Burton met with Feazell,

28

Diane Sanders, and Mike Sanders as a group and then individually, and ultimately concluded that he could not represent them a joint clients due to a potential conflict of interest. *Id.* at 67. Diane Sanders was later arrested, and she and Mike Sanders signed a form purportedly waiving their attorney–client privileged conversations with Burton. *Id.*

Federal prosecutors served Lawyer Burton with a grand jury subpoena and the issue arose whether the prosecutors could question Burton about his group discussions with Feazell, Diane Sanders, and Mike Sanders because Diane Sanders had waived the privilege. The district ruled that "any one of the three could waive the privilege for the joint discussions." *Id.* at 67. Apparently believing that the three co-clients needed a joint defense agreement, "the court stated that there was no evidence of a joint defense agreement and even if there had been the court's ruling would be the same. *Id.* at 67–68. The Fifth Circuit granted Feazell's emergency motion to stay the district court's order and accept an immediate appeal "of that portion of the order directing Burton to testify about the pre-representation interview with Burton in the presence of Diane and Mike Sanders." *Id.* at 68.

The Court recognized the "venerable rule emanating from the privilege" that the privilege protects pre-representation discussions between a lawyer and multiple clients seeking joint representation from that lawyer. *Id.* at 69 (citing *Restatement of The Law Governing Lawyers, Tentative Draft No. 2,* § 125, comments a-c, and Reporter's Notes (April 7, 1989) ("Tentative Draft")).

The Fifth Circuit therefore held that the District Court "was in error as to its conclusions of law when it ruled that there was no attorney-client privilege extant at the time of the joint meeting … and that *one of the jointly interviewed prospective clients could waive the privilege as*

29

*to all participants*." *Id.* at 70 (emphasis added). While this ruling pertained to pre-representation discussions between putative co-clients and a common lawyer, it followed the well-established rule post formal retention—that the attorney–client privilege protects communications between co-client and their common lawyer from compelled disclosure by third parties and that privilege waiver cannot occur unless all parties to the joint representation agree. District Courts within the Fifth Circuit have so held. *See, e.g.*, *In re Crescent Res., LLC*, 457 B.R. 506, 530 (Bankr. W.D. Tex. 2011) (ruling that "the Trust may not unilaterally waive the joint-client privilege and use jointly privileged information in proceedings involving third parties, absent a waiver from Duke") (relying on the *Restatement (Third) of the Law Governing Lawyers* and *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 380 (3d Cir. 2007)); *Ishee v. Fed. Nat. Mortg. Ass'n*, No. 2:13-CV-234-KS-MTP, 2014 WL 2162753, at *2 (S.D. Miss. May 23, 2014) ("Importantly, when the attorney-client privilege is jointly held, one privilege holder cannot waive the privilege on behalf of another privilege holder. The common-interest privilege prohibits one privilege holder's disclosure from waiving another's privilege. Every holder of the privilege has the right to resist disclosure."). As the District Court explained in *Akins v. Worley Catastrophe Response, LLC*, while the "Fifth Circuit held in *Auclair* that one *prospective* client cannot waive the attorney-client privilege on behalf of another prospective client as to confidential communications that were made to the attorney while the two were seeking joint representation,"

> waiving the joint-client privilege requires the consent of all joint clients. A wrinkle here is that a client may unilaterally waive the privilege as to its own communications with a joint attorney, so long as those communications concern only the waiving client; *it may not, however, unilaterally waive the privilege as to any of the other joint clients' communications or as to any of its communications that relate to other joint clients.*

*Akins*, 2013 WL 796095, at *12 (E.D. La. Mar. 4, 2013), *aff'd sub nom. Akins v. Sullivan*, 574 F. App'x 454 (5th Cir. 2014) (emphasis in original).

Here, it is undisputed that lawyer Sean McKenna represented Speights and Courville, individually and through their investment entities, as co-clients regarding healthcare operational, regulatory, and compliance issues, along with responding to an adversary subpoena issued by the United States Department of Justice. (McKenna Decl., ¶¶ 3–5). McKenna's engagement letters expressly explain the "Joint Representation" in accordance with the Texas Rules of Professional Conduct. (*Id.*, Exhs. A-1, A-2, and A-3). As set forth below, Courville intentionally elicited from Speights privileged communications that were part of joint representations with Courville and Speights. Courville's disclosure of Speights's privileged communications to the Government— or, more accurately, the Government's live intrusion into those confidential, co-client discussions—did not waive Speights's privilege and, consequently, the Government based its indictment on ill-gotten gains.

### 2.    *No Privilege-Sharing Agreement Is Required to Invoke Non-Waiver Rule*

At the April 12, 2023, hearing, the Court questioned whether Courville and Speights had a "joint defense agreement,"[87] also known as a "common interest agreement," from which counsel

---

[87] *See* Transcript, Sealed Motion Hearing as to Defendant Richard Speights, Case No. 3:21-CR-44-M (Apr. 12, 2023), at 9 (Court: "What I want to know is if you have a position that there is some legal obligation, either a legal obligation or a factual obligation, in this case that parties who jointly retain a lawyer and don't have a Joint Defense Agreement or discuss the terms that would normally be found in one have the right to prevent the other from waiving the privilege."); *id.* at 26 (Court: "I mean if you don't have a Joint Defense Agreement, it would seem that everyone would have the right to defend themselves fully, including based on advice of counsel. So that's, yet, another reason that I'm skeptical of the theory that there's some duty without it ever being articulated that parties can't waive the privilege without the permission of others."); *id.* at 28 (Court: "[M]y belief is that the privilege has been waived for everybody. And if you wanted to prevent that from happening, you either had to have separate counsel for everybody or, at the least, an agreement that that couldn't happen.").

31

infers the Court has concern that, absent a privilege-sharing agreement, either Courville or Speights could unilaterally waive privilege protections. But federal common law does not require the parties in a joint-client relationship with a single attorney (or single law firm or set of lawyers) to enter a privilege-sharing agreement before obtaining privilege protection against unilateral waiver.

The Court was perhaps considering the common-interest doctrine, also known by other names such as the joint-defense privilege or common legal interest privilege, wherein some courts require the parties to agree to a privilege-sharing arrangement before they can invoke a non-waiver rule. *See, e.g.*, *Elvis Presley Enters., Inc. v. City of Memphis*, 2020 WL 4015476, at *9 (W.D. Tenn. July 16, 2020) (ruling that doctrine did not cover lawyers' communications prior to entering an oral common-interest agreement); *Restatement (Third) of the Law Governing Lawyers* § 76 (2000) (applying doctrine where the parties with a common legal interest "agree" to share information); 1 Paul R. Rice, *Attorney–Client Privilege in the United States* § 4.33 (2011) (noting that the doctrine protects only communications shared pursuant to an express or implied agreement). The common-interest doctrine is separate and distinct from the joint-client doctrine recognized by *Auclair* and District Courts within the Fifth Circuit. The common-interest doctrine applies where two or more parties—each represented by separate counsel—agree to share pre-existing privileged information in furtherance of a common legal interest. *See, e.g.*, *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 365 (3d Cir. 2007) ("[T]he privilege only applies when clients are represented by separate counsel. Thus, it is largely inapplicable to disputes like this one that revolve around corporate family members' use of common attorneys (namely, centralized in-house counsel)"; *In re LTV Sec. Litig.*, 89 F.R.D. 595, 604 (N.D. Tex. 1981) (noting "that disclosure of privileged

information by an attorney to actual or potential co-defendants, or to their counsel, in the course of a joint defense does not constitute a waiver of the attorney-client privilege").  Unlike the joint-client doctrine—which involves the attorney–client privilege within an attorney-client(s) relationship, the common-interest doctrine is not a privilege but rather a non-waiver rule that allows parties—represented by separate counsel—to share privileged information without waiving privilege protections. *Luckenbach Texas, Inc. v. Engel*, No. 1:19-CV-00567-DH, 2022 WL 9530041, at *3 (W.D. Tex. Oct. 14, 2022) ("The common interest privilege is not a separate privilege, but is a rule of non-waiver that extends the attorney-client privilege and the work product doctrine by creating an exception to the general rule that the privilege is waived upon disclosure of privileged information with a third party.") (quotations omitted).

Because the joint-client doctrine, rather than the common-interest doctrine, applies to the Speights and Courville communications, the only relevant agreement that triggers their privilege and non-waiver duties is their agreement to jointly retain counsel—McKenna and Dugger—regarding a legal matter of common interest.  McKenna and Dugger clearly represented Speights and Courville as joint clients and, consequently, the joint-client doctrine precludes Courville's actions from waiving Speights's privileged communications with their two lawyers.

### 3.    *Speights's Disclosures Did Not Waive Work Product Protections*

McKenna's representation of Speights included healthcare regulatory compliance advice in an effort to avoid civil or criminal liability but also Speights's response to the Department of Justice's subpoena.  (McKenna Decl., ¶ 3).  The work-product doctrine, therefore, protects McKenna's opinion work product, such as legal strategies, advice, opinions, and the like from use by Speights's adversaries.  *S.E.C. v. Brady*, 238 F.R.D. 429, 442 (N.D. Tex. 2006) ("The Fifth Circuit has recognized 'opinion work product' and noted that "some courts have provided an

almost absolute protection for such materials."). In other words, the Government cannot—as it wants to do here—"perform its functions either without wits or on wits borrowed from the adversary." *Hickman v. Taylor*, 329 U.S. 495, 516 (1947) (Jackson, J., concurring).

Even if Courville was a mere third party, rather than Speights's co-client, Speights's disclosures of his lawyers' legal strategies, legal opinions, and legal strategies did not waive the work-product protection over those communications. As this Court has explained, "[t]he work-product doctrine is very different from the attorney-client privilege with regard to possible waiver." *Mir v. L-3 Commc'ns Integrated Sys., L.P.*, 315 F.R.D. 460, 467 (N.D. Tex. 2016). "Although the attorney-client privilege exists to protect the confidential communications between an attorney and client and, thus, is generally waived by disclosure of confidential communications to third parties, the work-product protection exists to promote the adversary system by safeguarding the fruits of an attorney's trial preparations from the discovery attempts of an opponent." *Id.* (citing *Shields v. Sturm, Ruger & Co.*, 864 F.2d 379, 382 (5th Cir. 1989)). Because of this critical distinction, "the mere voluntary disclosure to a third person is insufficient in itself to waive the work product privilege." *Shields*, 864 F.2d at 382; *In re Grand Jury Subpoena*, 220 F.3d 406, 409 (5th Cir. 2000) ("[B]ecause the work product privilege looks to the vitality of the adversary system rather than simply seeking to preserve confidentiality, it is not automatically waived by the disclosure to a third party."); *see also Madison v. Vintage Petroleum, Inc.*, 122 F.3d 1066 (5th Cir. 1997) (finding no waiver where "nothing in the record establishes that the plaintiff in the instant case was privy to the disclosure of the subject reports"). Rather, waiver occurs when a party voluntarily discloses work product to a known adversary or to another person whom the disclosing party knows would substantially increase the "opportunities for potential adversaries to obtain the information."

34

*Ecuadorian Plaintiffs v. Chevron Corp.*, 619 F.3d 373, 378 (5th Cir. 2010); *Shields*, 864 F.2d at 382 (holding that "the work product privilege is waived when the attorney requests the witness to disclose the information or when the attorney discloses the information to the court voluntarily or makes no objection when it is offered").

Here, it is undisputed that Courville was a confidential informant and not known to Speights to be an agent of his Government adversary. Nor did Speights have any reason belief that Courville had transformed from a co-client—with whom he shared a privilege—to a person who would disclose his work product to the Government. As a result, Speights's discussions with Courville about his—their—attorney's legal strategies, legal opinions, and related legal advice did not waive the work product protections over those opinions.

### 4. *Specifically Designated Attorney-Client Privileged Disclosures in the Undercover Recording Transcripts*

The below designations from the transcripts of the undercover recordings made by Courville and in the possession of the Prosecution Team for two years contain privileged information related to the legal advice that Speights received from McKenna and Dugger regarding healthcare regulatory and compliance advice. In these conversations, Courville specifically asked questions about the attorneys' advice, knowledge, and strategy. As discussed above, because Speights and Courville were jointly represented by McKenna and Dugger, the attorney-client privileged applies to each of these conversations and has not been waived. The following excerpts reflect the privileged information in the Government's recordings.

Transcript Privilege Designation No. 1:

    [00:03:50] MR. SPEIGHTS:    But -- even still -- what could they say? I mean -- I stand by -- I stand by Sean McKenna and I stand by

|  |  |
|---|---|
|  | that other guy -- whatever his name was -- the lawyer. |
| [00:03:57] MR. COURVILLE: | Keith?  But is McKenna's sticking -- like -- I've heard mixed things.  Like -- is McKenna sticking by with what he said or not? |
| [00:04:04] MR. SPEIGHTS: | I don't know.  I know that Keith is. |
| [00:04:05] MR. COURVILLE: | Keith is?  Okay. |
| [00:04:08] MR. SPEIGHTS: | Mm-hmm.[88] |

Transcript Privilege Designation No. 2:

|  |  |
|---|---|
| [00:16:39] MR. SPEIGHTS: | Yeah, but it wasn't and here's the deal, man.  He -- he met with Ark in Dallas with Sean McKeena - you know - that morning.  And so -- uh -- |
| [00:16:50] MR. COURVILLE: | That was -- that was -- that was with -- I think -- was Rob there?  Because I wasn't there. |
| [00:16:53] MR. SPEIGHTS: | Rob was in that meeting -- Rob was in that meeting. |
| [00:16:55] MR. COURVILLE: | Okay.  You weren't there, though, were you? |
| [00:16:57] MR. SPEIGHTS: | I was there, but I was not in that meeting. |
| [00:16:59] MR. COURVILLE: | Oh, you weren't?  Okay -- cool. |
| [00:17:00] MR. SPEIGHTS: | Nope, so -- |
| [00:17:00] MR. COURVILLE: | That's good. |
| [00:17:02] MR. SPEIGHTS: | Yep.  So -- I mean -- they were there when Sean -- Sean came out and said - you know - out of everybody's program, I like theirs the best. |
| [00:17:09] MR. COURVILLE: | I remember that, yeah.[89] |

Transcript Privilege Designation No. 3:

|  |  |
|---|---|
| [00:17:25] MR. SPEIGHTS: | So -- I mean -- I just don't understand all that.  But -- I don't think -- I -- I don't think that JB is going to end up trying to do that -- uh -- Jim, because his |

---

[88] Ex. H (Feb. 14, 2021 Transcript), at [00:03:47-00:04:08].

[89] *Id.* at [00:16:39-00:17:09].

|  | whole stance right now is -- I did everything under lawyer protection.  You know what I mean? |
|---|---|
| [00:17:42] MR. COURVILLE: | Yeah. |
| [00:17:42] MR. SPEIGHTS: | They didn't say -- well you shouldn't do this or -- they said I can do it.  As a matter of fact -- they wrote the fucking program and the contract -- knew exactly what the fuck we were doing.[90] |

Transcript Privilege Designation No. 4:

|  |  |
|---|---|
| [01:51:000] MR. COURVILLE: | He's like, did the attorneys know that, y'all, like, is that the contracts that Grisham, that we signed, that Grisham signed from Hall Render, |
| [02:06:000] MR. COURVILLE: | and that we decided to pay a different way, or did they know that we were paying a percentage? |
| [02:14:000] MR. SPEIGHTS: | Man, I can't answer that. I mean, I'm assuming they knew we were paying the exact way we were paying. |
| [02:21:000] MR. COURVILLE: | Okay. |
| [02:22:000] MR. SPEIGHTS: | I mean, we did anything the lawyers didn't tell us not to do, I don't know that. I mean, I really don't. |
| [02:27:000] MR. COURVILLE: | Right, right. I just -- |
| [02:29:000] MR. SPEIGHTS: | That shit could work for Hall Render was there every step of the way, even in the last meeting. You know what I mean?[91] |

Transcript Privilege Designation No. 5:

|  |  |
|---|---|
| [05:45:000] MR. SPEIGHTS: | and I think he had a percentage contract that Hall Render approved, and that's how we did things. |
| [05:51:000] MR. COURVILLE: | Okay. |
| [05:53:000] MR. SPEIGHTS: | Whatever we were doing, as it relates to Matt, Hall Render was approved at every step of the way, |

---

[90] *Id*. at [00:17:25-00:17:42].

[91] Ex. C (Apr. 20, 2021 Transcript), at [01:51:00-02:20:00].

| | |
|---|---|
| [05:58:000] MR. SPEIGHTS: | because I remember being in meetings with Keith and that chick, I can't remember her name, |
| [06:02:000] MR. SPEIGHTS: | multiple times with Matt, knowing that she was good. |
| [06:06:000] MR. SPEIGHTS: | I mean, he was good, and what we were doing was fine. They were signed off on all that. |
| [06:10:000] MR. SPEIGHTS: | They loved Matt the most. You know what I mean? |
| [06:12:000] MR. COURVILLE: | Yeah. All right, man. I'm stressed. I mean, I just had no clue about that shit. |
| [06:16:000] MR. COURVILLE: | You know what I'm saying? And it's just like, I mean, that puts—[92] |

Transcript Privilege Designation No. 6:

| | |
|---|---|
| [07:24:000] MR. SPEIGHTS: | Whatever it was, it was a percentage, and it was signed on file by Hall and Render and Sean McKenna. |
| [07:28:000] MR. COURVILLE: | Right. |
| [07:30:000] MR. COURVILLE: | So-- |
| [07:31:000] MR. COURVILLE: | All right, bro. |
| [07:32:000] MR. SPEIGHTS: | What I hear, Hall and Render are standing by everything they told us. |
| [07:36:000] MR. COURVILLE: | Well, that's good. |
| [07:38:000] MR. COURVILLE: | Because, I mean, fuck, Hall and Render, they have a copy of fucking Egan's playbook. |
| [07:43.000] MR. COURVILLE: | You know what I'm saying? |
| [07:44:000] MR. COURVILLE: | Like, they know everything he was doing. |
| [07:45:000] MR. SPEIGHTS: | At the end of the day, they know everything he was doing. |
| [07:47:000] MR. SPEIGHTS: | At the end of the day, and Matt even changed a couple things, they wanted him to change. |
| [07:50:000] MR. SPEIGHTS: | So, everything. Everything they wanted, Matt did. |

---

[92] *Id*. at [05:45:00-06:16:00].

[07:53:000] MR. SPEIGHTS:      So, and we did.[93]

Transcript Privilege Designation No. 7:

| | |
|---|---|
| [11:38:000] MR. COURVILLE: | I mean, but you think Hall Render is going to-- |
| [11:39:000] MR. COURVILLE: | I mean, we're going to sue them, but you think they're going to stand by everything? |
| [11:42.000] MR. SPEIGHTS: | Last I heard, and that was months ago, but they were standing by everything that they |
| [11:46.000] MR. SPEIGHTS: | advised us on. |
| [11:47:000] MR. COURVILLE: | And what about Sean? |
| [11:48:000] MR. SPEIGHTS: | I don't know about McKenna.[94] |

Transcript Privilege Designation No. 8:

| | |
|---|---|
| [00:02:53] MR. COURVILLE: | Are you really putting that? |
| [00:02:53] MR. SPEIGHTS: | Mm-hmm. |
| [00:02:55] MR. COURVILLE: | Holy shit.  It's not funny -- it's actually sad. |
| [00:03:00] MR. SPEIGHTS: | Yeah.  He didn't know that people -- this is real life shit for people, you know what I mean?  Like -- |
| [00:03:09] MR. COURVILLE: | Are you -- are you certain on that? |
| [00:03:11] MR. SPEIGHTS: | What? |
| [00:03:11] MR. COURVILLE: | That he killed himself? |
| [00:03:12] MR. SPEIGHTS: | Yeah -- I'm sure. |
| [00:03:45] MR. COURVILLE: | Barrett asked me if I knew that guy.  Mark Leavy. |
| [00:03:51] MR. SPEIGHTS: | Why is he important? |
| [00:03:52] MR. COURVILLE: | I have no clue.  I told him I didn't know who the fuck he was.  Do you know him? |
| [00:03:56] MR. SPEIGHTS: | Mm-hmm. |
| [00:03:59] MR. COURVILLE: | What is his deal? |
| [00:04:00] MR. SPEIGHTS: | He was a distributor and I met him at those meetings and shit. |
| [00:04:04] MR. COURVILLE: | Oh, okay.  So -- he's just a marketer? |

---

[93] *Id*. at [07:24:00-07:53:00].

[94] *Id*. at [11:38:00-011:48:00].

| | |
|---|---|
| [00:04:05] MR. SPEIGHTS: | Yeah. |
| [00:04:06] MR. COURVILLE: | Okay.  I never heard of him before.  It was -- was it called Future Care?  Did they [Inaudible] for us? |
| [00:04:13] MR. SPEIGHTS: | No. |
| [00:04:13] MR. COURVILLE: | No.  So -- out of all these people, you didn't know -- who did we -- who did we really know before fucking Berberian came into the -- came into the picture? |
| [00:04:53] MR. SPEIGHTS: | Matt [Inaudible] |
| [00:04:58] MR. COURVILLE: | Yeah.  What is Wolf Branch [Inaudible] |
| [00:05:06] MR. SPEIGHTS: | I never heard of that. |
| [00:05:10] MR. COURVILLE: | Empath.  I've heard that name right there -- Scott [Inaudible].  I don't know from where, though.  It might have on that report.  Here's what I don't understand is that -- Gene and them have the fucking -- like -- they're asking the same fucking questions -- I'm -- like -- dude -- it's on the fucking reports. |
| [00:05:31] MR. SPEIGHTS: | How often were the distributors paid? |
| [00:05:36] MR. COURVILLE: | Oh -- I -- |
| [00:05:36] MR. SPEIGHTS: | Was it once a week? |
| [00:05:36] MR. COURVILLE: | I have no clue.  I wouldn't think that because Rob -- did Rob wire -- I could find out -- I could ask Rob. |
| [00:05:44] MR. SPEIGHTS: | Ask him.  Don't text him.  Call him.[95] |

Transcript Privilege Designation No. 9:

| | |
|---|---|
| [00:11:38] MR. COURVILLE: | See -- I'm more worried about Egan because to me -- the majority of our business was with him and we didn't know what those other guys were doing and whenever they said stopped -- we stopped doing all of it.  We continued [Inaudible] |
| [00:11:53] MR. SPEIGHTS: | I believe you were there.  Right before we got raided -- we had a meeting -- another compliance meeting |

---

[95] Exhibit K, Transcript 0416.004 (Apr. 28, 2021), at [00:02:53-00:05:36].

|                              | in Matt's office -- and [Inaudible] was there, nodding their head yes the whole time. |
| [00:12:05] MR. COURVILLE: | No -- no -- that's the first time I ever had gone to Matt's place.[96] |

Transcript Privilege Designation No. 10:

| [00:40:38] MR. SPEIGHTS: | [Inaudible] So -- the next morning, Rob, Berberian, and Casey are -- met with Sean [Inaudible] laid out their program to Sean and Sean said I like them more than anybody else [Inaudible] -- the problem is -- they weren't doing what they told Sean they were doing. |
| [00:40:59] MR. COURVILLE: | Yeah. [97] |

Transcript Privilege Designation No. 11:

| [00:41:35] MR. SPEIGHTS: | You know?  Say -- look -- they committed fraud -- we don't want no part of it.  We put the $1 million, gave it to Sean McKenna -- what else can we fucking do? |
| [00:41:43] MR. COURVILLE: | Right.  But my thing is -- what about we were active participants?  I'm not just saying -- when I say we -- I'm talking about not you and I necessarily -- I'm talking about the entity itself.  What about if there was a percentage contract and we [Inaudible] because we -- we all know [Inaudible] we all know we paid a fucking percentage. |

Transcript Privilege Designation No. 12:

| [00:42:19] MR. SPEIGHTS: | Because Sean McKenna and Paul [Inaudible] said -- pay the percentage and it's okay until we can get fair |

---

[96] Ex. J (Apr. 28, 2021 Transcript), at [00:11:38-00:12:05].
[97] Ex. I (Apr. 28, 2021 Transcript), at [00:40:38-00:40:59].

41

|                              | market value from this company.  They signed off on that -- and that's a fact. |
| [00:42:37] MR. COURVILLE:    | But -- will those motherfuckers say that? |
| [00:42:40] MR. SPEIGHTS:     | [Inaudible] right now.  The last time I talked to Berberian was a couple of months ago.  He -- and Grisham was standing right [Inaudible] there with him.[98] |

Transcript Privilege Designation No. 13:

|                              |                              |
| [00:17:37] MR. SPEIGHTS:     | And I go back to the day that -- uh -- McKenna and what was the other lawyer's name -- |
| [00:17:46] MR. COURVILLE:    | Keith. |
| [00:17:46] MR. SPEIGHTS:     | Keith -- said -- fire all your customers but Matt -- |
| [00:17:50] MR. COURVILLE:    | Right. |
| [00:17:50] MR. SPEIGHTS:     | We did it.  That day. |
| [00:17:51] MR. COURVILLE:    | Yeah. |
| [00:17:53] MR. SPEIGHTS:     | [Inaudible] we're done.  What else are you supposed to do?  You knew we were operating with these people.  Everything -- you knew everything about our business -- the lawyers.  Like -- you knew everything about it.  And -- the minute you said fire them -- we do. But -- you can keep Matt. Well, we're paying Matt the exact same way we're paying everybody else.  They just liked his process better, right? |
| [00:18:11] MR. COURVILLE:    | Right.[99] |

Transcript Privilege Designation No. 14:

|                              |                              |
| [00:20:42] MR. COURVILLE:    | My question is -- how did they know -- did you tell him?  That's right -- you've already met with him, though -- and given him the [Inaudible]. |

---

[98] *Id*. at [00:41:35-00:41:43].
[99] *Id*. at [00:42:19-00:42:40].

42

| | |
|---|---|
| [00:20:58] MR. SPEIGHTS: | Yeah. |
| [00:20:59] MR. COURVILLE: | Okay -- all right. Educational background. School of fucking hard knocks. |
| [00:21:05] MR. SPEIGHTS: | Yeah -- no shit. Um -- [Inaudible] 2019 -- uh -- took -- a few samples -- referenced them out -- [Inaudible] |
| [00:21:49] MR. COURVILLE: | That was open and shut down. |
| [00:21:50] MR. SPEIGHTS: | Never operated. |
| [00:21:52] MR. COURVILLE: | Right. [Inaudible] |
| [00:22:08] MR. SPEIGHTS: | The rate -- the rate on [Inaudible] wouldn't that be around right? |
| [00:22:11] MR. COURVILLE: | Yeah. |
| [00:22:12] MR. SPEIGHTS: | [Inaudible] you know what I mean? |
| [00:22:15] MR. COURVILLE: | Yeah. I mean -- did you ever even [Inaudible]? Yeah. |
| [00:23:06] MR. SPEIGHTS: | Is that accurate? |
| [00:23:13] MR. COURVILLE: | Yep. [100] |

Transcript Privilege Designation No. 15:

| | |
|---|---|
| [00:24:24] MR. COURVILLE: | James has got to already know this shit, doesn't he? I don't know. That right there -- if they've got -- if they've got emails -- |
| [00:25:25] MR. SPEIGHTS: | Uh-huh. |
| [00:25:26] MR. COURVILLE: | That's not a -- that's not a true statement. Because -- the reason why I know that is -- remember whenever he got mad at you and he forwarded the emails about y'all's agreement and how he let you borrow the money? |
| [00:25:40] MR. SPEIGHTS: | Mm-hmm. |
| [00:25:42] MR. COURVILLE: | He put -- he put in some type of contract. I remember seeing that. |
| [00:25:48] MR. SPEIGHTS: | Contract on what? |

---

[100] Ex. G (Apr. 28, 2021), at [00:17:55-00:19:42].

[00:25:49] MR. COURVILLE:      Like y'all's agreement -- remember how he was -- like -- I'm such a nice guy -- I'm gonna switch from 70 - you know what I'm saying?  You remember how he's like -- I'll let the guy borrow money -- blah -- blah -- blah -- so I'm just saying -- that -- you might want to check your email of that.

[00:26:03] MR. SPEIGHTS:      Oh, no -- that was -- uh -- definite -- yeah -- yes.  Okay -- you're right.

[00:26:19] MR. COURVILLE:      Because they -- they -- I don't know if he sent over the contract -- though -- between you and him.  I don't know -- but he did -- he made reference to it.  Dude -- that was the biggest bitch move in the world.  He held over -- he held it over our head -- the $200,000.00.  Yeah.  This is such bullshit.  How many different [Inaudible] are there?  Fucking a million?

[00:27:48] MR. SPEIGHTS:      I guess.

[00:28:47] MR. COURVILLE:      With that management company -- they own the lab or is it there to manage it?

[00:28:49] MR. SPEIGHTS:      I don't know.

[00:28:51] MR. COURVILLE:      [Inaudible]

[00:28:51] MR. SPEIGHTS:      I don't know.  I mean -- how was our ownership listed in the thing?  I don't know.[101]

Transcript Privilege Designation No. 16:

[00:30:19] MR. COURVILLE:      Okay.  That right there -- that's -- to me -- that's the big thing.  HSD -- it -- it -- it told us everything we had to do.

[00:30:51] MR. SPEIGHTS:      Mm-hmm.

[00:30:51] MR. COURVILLE:      Do you not agree with that?

[00:30:56] MR. SPEIGHTS:      No -- yeah.

---

[101] *Id*. at [00:24:24-00:28:51].

[00:30:56] MR. COURVILLE:          I mean -- I want to say it was God.  I mean --
                                    everything -- everything was what that said.  Was
                                    there an actual gentleman with between TCL and
                                    HSD?  I don't know.[102]

Transcript Privilege Designation No. 17:

[00:35:32] MR. COURVILLE:          Who is that?
[00:35:32] MR. SPEIGHTS:           Who?
[00:35:33] MR. COURVILLE:          Who is Sporn [sp]?
[00:35:36] MR. SPEIGHTS:           Um -- he owns a software company that -- uh -- he
                                    leases to -- uh -- telemed people.
[00:35:44] MR. COURVILLE:          Okay.  We never met him, though -- did we?  So --
                                    do you feel like you can trust him?
[00:36:29] MR. SPEIGHTS:           Who?  Matt?  Yeah.[103]

5.    ***Specifically Designated Work-Product Disclosures in the Undercover
      Recording Transcripts***

The below work-product designations from the transcripts of the undercover recordings made by Courville and in the possession of the Prosecution Team for two years contain impermissibly obtained work product derived from an email that Speights's attorneys, Gene Besen and Bethanie Livernois, prepared for his proffer with the Government and sent to Speights in order to render legal advice. The email reflected legal strategies, legal opinions, and legal advice regarding counsels' understanding of the important entities, individuals, and conduct related to the Government's investigation, as well as Speights's relationship with such entities and individuals. As such, work product protects the contents of the email as well as the conversations in the transcripts that either reflect the contents of the email or were substantially derived from the

---

[102] *Id*. at [00:30:19-00:30:56].
[103] *Id*. at [00:35:32-00:36:29].

contents of the email.  As discussed above, Speights's work product protection was not waived by Speights'sconversation with Courville. The below excerpts reflect the protected work-product information in the Government's recordings.

<u>Transcript Work-Product Designation No. 1:</u>

| | |
|---|---|
| [00:11:11] MR. SPEIGHTS: | So -- this email is from Bethanie, that's Gene's associate.  You won't tell anybody I'm showing this to you, will you? |
| [00:11:21] MR. COURVILLE: | No.<br>[Inaudible/Mumbled conversation] |
| [00:11:37] MR. SPEIGHTS: | [inaudible] sent it to Grisham and Barrett, right?<br>[Inaudible/Mumbled conversation] |
| [00:11:59] MR. SPEIGHTS: | [Inaudible] HSD paid it, right?  But -- did it come out of funds and -- |
| [00:12:06] MR. COURVILLE: | I don't -- dude -- I couldn't tell you.  I have no clue.<br>[Inaudible/Mumbled conversation] |
| [00:12:22] MR. COURVILLE: | Who is priority [inaudible] |
| [00:12:33] MR. SPEIGHTS: | Something might be CC'ed on that message but it's not priority |
| [00:12:49] MR. COURVILLE: | [Inaudible] what is this -- what is this about a [Inaudible]? |
| [00:12:52] MR. SPEIGHTS: | This? |
| [00:12:53] MR. COURVILLE: | Yeah. |
| [00:12:56] MR. COURVILLE: | We paid too much?<br>[Inaudible/Mumbled conversation] |
| [00:13:13] MR. COURVILLE: | Do you know half those people? |
| [00:13:16] MR. SPEIGHTS: | This is the only one I ever heard. |
| [00:13:18] MR. COURVILLE: | Right.  That's what I'm saying.  Like -- |
| [00:13:21] MR. SPEIGHTS: | That's the only one I know.  And I know -- I know this guy right here because I've met him in meetings, but I didn't know him, prior -- - you know.  This guy -- I know this guy now because I've been in meetings with him. |

46

| | |
|---|---|
| [00:13:33] MR. COURVILLE: | Right. |
| [00:13:35] MR. SPEIGHTS: | I don't know -- this dude killed himself over all this shit. |
| [00:13:40] MR. COURVILLE: | Are you kidding me? |
| [00:13:40] MR. SPEIGHTS: | Nope.  [Inaudible] killed himself. |
| [00:13:50] MR. COURVILLE: | I'm trying to figure out why he's [Inaudible].  This right here -- [Inaudible] -- |
| [00:14:09] MR. SPEIGHTS: | $200,000.00? |
| [00:14:11] MR. COURVILLE: | No -- the one [Inaudible] [Inaudible/Mumbled conversation] |
| [00:14:20] MR. COURVILLE: | [Inaudible] dictated.[104] |

Transcript Work-Product Designation No. 2:

| | |
|---|---|
| [00:15:29] MR. COURVILLE: | Yeah.  Whenever I see those types of questions, though -- it just -- |
| [00:15:41] MR. SPEIGHTS: | This is my lawyer trying to protect me [Inaudible] you know what I mean?  Like -- I don't know -- I don't know the answer to that for sure -- |
| [00:15:50] MR. COURVILLE: | It was -- it was done -- it was done by barbarians. |
| [00:15:56] MR. SPEIGHTS: | Yeah -- because they kept holding it over our heads. |
| [00:15:56] MR. COURVILLE: | Yeah -- yeah.  [Inaudible] but -- [Inaudible] |
| [00:16:04] MR. COURVILLE: | No -- do you know that right there? |
| [00:16:05] MR. SPEIGHTS: | Which one? |
| [00:16:05] MR. COURVILLE: | [Inaudible] role as related -- CCL, [Inaudible] -- so TCL [Inaudible] that was the management company, right? |
| [00:16:16] MR. SPEIGHTS: | It was supposed to be, but it never did.   Remember? We stopped -- we formed that really late.  It was also HSD and Andrew. |
| [00:16:20] MR. COURVILLE: | Right. |

---

[104] Ex. F (Apr. 28, 2021 Transcript) at [00:11:11-00:14:20].

| | |
|---|---|
| [00:16:20] MR. SPEIGHTS: | Right? |
| [00:16:21] MR. COURVILLE: | I thought Andrew ran TCL and [Inaudible], too? |
| [00:16:23] MR. SPEIGHTS: | Oh, he did.  But -- it probably only operated for a couple of months [Inaudible] it was to replace HSD. |
| [00:16:32] MR. COURVILLE: | Because someone asked me about it -- I think it was [Inaudible] asked me about TCL and [Inaudible] Rob and I was -- like -- I don't even really remember them ever being in the picture. |
| [00:16:39] MR. SPEIGHTS: | No, it was really HSD that did everything. |
| [00:16:41] MR. COURVILLE: | Right. |
| [00:16:41] MR. SPEIGHTS: | You know?  And went in [Inaudible] all the lawyers that were buttoned up.  All we do is meet with fucking lawyers -- all the time. |
| [00:16:51] MR. COURVILLE: | Yeah. |
| [00:16:51] MR. SPEIGHTS: | You know?  [Inaudible] You're as bad as me and I've got ADD and I'm -- like -- I ain't listening to that shit.  I just know we know we have a huge compliance department and we've got a bunch of fucking lawyers to tell us what to do.  So -- I mean -- if anything was done wrong --[105] |

## B.    Government Has Violated Speights's Fifth and Sixth Amendment Constitutional Rights

By conscripting Courville to intentionally subvert Speights's relationships with his attorneys, the Prosecution Team has violated Speights's Sixth Amendment right to counsel and Fifth Amendment right to due process.  The Fifth Circuit has long recognized that, "an intrusion by the government upon the confidential relationship between a criminal defendant and his attorney, either through surreptitious electronic means or through an informant, is a violation of

---

[105] *Id*. at [00:15:29-00:16:51].

48

the Sixth Amendment right to counsel." *United States v. Zarzour*, 432 F.2d 1, 3 (5th Cir. 1970) (citing *Hoffa v. United States*, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966); *Black v. United States*, 385 U.S. 26 (1966)).   "[T]he Sixth Amendment is violated whenever a government informant actively engages a defendant in conversation that is likely to elicit incriminating statements." *United States v. Terzado-Madruga*, 897 F.2d 1099, 1110 (11th Cir. 1990).  Similarly, "[t]he Fifth Amendment's due process clause guarantees a suspect's right to effective and substantial assistance of counsel." *United States v. Renzi*, 722 F. Supp. 2d 1100, 1130 (D. Ariz. 2010) (citing *United States v. Irwin*, 612 F.2d 1182, 1185 (9th Cir.1980) and *United States v. Haynes*, 216 F.3d 789, 797 (9th Cir. 2000)).  Therefore, "[p]rior to indictment, a defendant is deprived of due process when the government's interference with the attorney-client relationship results in an ineffective assistance of counsel which prejudices the defendant." *United States v. Johnson*, 818 F. Supp. 1004, 1006 (S.D. Tex. 1993).  Notably, "regardless of who initiates the conversation, the Sixth Amendment is violated whenever a government informant actively engages a defendant in conversation that is likely to elicit incriminating statements." *United States v. Terzado-Madruga*, 897 F.2d 1099, 1110 (11th Cir. 1990) (Sixth Amendment was violated where prosecutor allowed informant to continue his normal associations in order to obtain incriminating information).

A Sixth Amendment violation can occur in any of three ways: "when the government (1) intentionally plants an informer in the defense camp; (2) when confidential defense strategy information is disclosed to the prosecution by a government informer; or (3) when there is no intentional intrusion or disclosure of confidential defense strategy, but a disclosure by a government informer leads to prejudice to the defendant." *See Weatherford v. Bursey*, 429 U.S.

49

545 (1977). As discussed below, the Prosecution Team has violated Speights's Sixth Amendment rights in all three ways as a result of the intentional intrusion into the defense camp, disclosure of defense strategy information, and prejudice to Speights.

A Fifth Amendment due process violation occurs when the government engages in conduct "'so outrageous' that it violates the principle of 'fundamental fairness' under the due process clause of the Fifth Amendment." *United States v. Johnson*, 68 F.3d 899, 902 (5th Cir. 1995) (citing *United States v. Russell*, 411 U.S. 423, 431-32 (1973)). Admittedly, the outrageous government misconduct standard is demanding and will only be applied "in the rarest circumstances." *Id.* As a result, "courts have rejected its application with almost monotonous regularity." *United States v. Nolan-Cooper*, 155 F.3d 221, 230 (3d Cir. 1998) (quoting *United States v. Santana*, 6 F.3d 1, 4 (1st Cir.1993)). However, circumstances in this case are neither monotonous nor regular. Deterring situations like the present is the reason why, despite the high burden, the Fifth Circuit has repeatedly "expressly declined to foreclose the possibility that governmental ineptitude and carelessness could be so abhorrent as to warrant a dismissal with prejudice." *United States v. Swenson*, 894 F.3d 677, 684 (5th Cir. 2018) (quoting *United States v. Fulmer*, 722 F.2d 1192, 1196 (5th Cir. 1983)).

While the Fifth Circuit has not yet addressed the standard for determining when the government's intrusion into an attorney-client relationship constitutes outrageous government conduct, a number of courts in other Circuits have adopted the Third Circuit's test set out in *Voigt*, which the Fifth Circuit has cited with approval in related contexts.[106] Under *Voigt* and its progeny,

---

[106] *See Parker v. Thaler*, No. 2:08-CV-245, 2011 WL 7090404, at *13 (N.D. Tex. Dec. 30, 2011), report and recommendation adopted, No. 2:08-CV-245, 2012 WL 213277 (N.D. Tex. Jan. 24, 2012) (citing *United States v. Voigt,* 89 F.3d 1050, 1065 (3d Cir.), *cert. denied,* 519 U.S. 1047,

the defendant must show: "(1) governmental knowledge of the attorney-client relationship; (2) deliberate intrusion into that relationship; and (3) actual and substantial prejudice." *United States v. Segal*, 313 F.Supp.2d 774, 780 n. 8 (N.D.Ill. 2004); *see also Voigt*, 89 F.3d at 1067; *United States v. Kennedy*, 225 F.3d 1187, 1195 (10th Cir. 2000); *United States v. Williams*, No. 8:09CR457, 2011 WL 1058920, at *11 (D. Neb. Mar. 21, 2011), aff'd, 720 F.3d 674 (8th Cir. 2013). Here, the government has indisputably known of Speights's attorney-client relationships since at least 2020.[107]

Accordingly, as discussed below, the Prosecution Team has violated Speights's Sixth Amendment right to counsel and Fifth Amendment right to due process by planting an informant in the defense camp in order to deliberately intrude into Speights's attorney-client relationships and causing Speights actual and substantial prejudice.

### 1. *The Court Should Not Permit the Prosecution Team to Evade Sixth Amendment Scrutiny by Front-Loading Its Misdeeds*

The Prosecution Team's misconduct should not escape Sixth Amendment scrutiny merely because the Prosecution Team tactically chose to invade and impair Speights's attorney relationships before formally indicting him. The Sixth Amendment right to counsel attaches "when the government has used the judicial machinery to signal a commitment to prosecute" because that constitutes "the point at which the government has committed itself to prosecute, the adverse positions of government and defendant have solidified, and the accused find himself faced

---

117 S.Ct. 623, 136 L.Ed.2d 546 (1996) ("[T]he judiciary is extremely hesitant to find law enforcement conduct so offensive that it violates the Due Process Clause.").

[107] *See* Joint Status Report, Ex. B (ECF Doc. No. 120-2), at 3 n.3 ("The Prosecution Team recalls learning about your representation of Mr. Speights in approximately January 2020.").

with the prosecutorial forces of organized society." *Rothgery v. Gillespie Cnty., Tex.*, 554 U.S. 191, 198, 211 (2008).

Here, while the Superseding Indictment against Speights was not returned until December 6, 2022,[108] the original Indictment against Grisham and Wilburn was returned over a year earlier on September 17, 2021,[109] and the Government filed its Complaint for Forfeiture related to this investigation against Trinity Clinical Labs over a year before then, on February 21, 2020.[110] Given the Government's 2020 use of "judicial machinery" in relation to this investigation, along with the Government's extensive activities targeting Speights—which were significant enough to cause Speights to retain counsel and for the Prosecution Team to be aware of counsel by January 2020[111]—it is clear that the "adverse positions of government and defendant" had solidified at some point 2020, long before Courville began recording conversations with Speights in February 2021. Speights certainly found "himself faced with the prosecutorial forces of organized society" by the time the Prosecution Team conscripted Courville to target Speights and his attorney relationships.

Further, as the Government currently maintains, the Prosecution Team's pre-indictment misconduct successfully manipulated Speights into waiving his privilege over certain communications with his attorneys McKenna and Dugger. These pre-indictment privilege waivers have subsequently impaired Speights's ability to rely on his attorney-client relationships post-indictment. This is exactly the type of situation contemplated by the Second Circuit in *U.S. v.*

---

[108] Superseding Indictment (ECF Doc. No. 42).
[109] Indictment (ECF Doc. No. 1).
[110] *See* Complaint for Forfeiture, at 14 (Case No. 3:20-cv-00442-B, ECF Doc. No. 1).
[111] *See* Joint Status Report, Ex. B (ECF Doc. No. 120-2), at 3 n.3 ("The Prosecution Team recalls learning about your representation of Mr. Speights in approximately January 2020.").

*Stein*, where it noted that "[w]hen the government acts prior to indictment so as to impair the suspect's relationship with counsel post-indictment, the pre-indictment actions ripen into cognizable Sixth Amendment deprivations upon indictment." *United States v. Stein*, 541 F.3d 130, 153 (2d Cir. 2008).

Accordingly, the Court should judge the Prosecution Team's manipulation of Speights's attorney relationships under standards of both Fifth and Sixth Amendments. *See United States v. Hungerford*, 2019 WL 1903212, at *10 (E.D. La. Apr. 29, 2019) ("Depending on when it occurs, government misconduct which subverts a defendant's relationship with his [attorney] may be judged under standards of both Fifth and Sixth Amendments.") (quoting *United States v. Marshank*, 777 F.Supp. 1507, 1518 (N.D. Cal. 1991)).

### 2.    *Prosecution Team Intentionally Intruded Into Speights's Attorney Relationships*

Far from the Filter Team Letter's representation that Courville was advised to avoid privileged information, the records only support the conclusion that the Prosecution Team intentionally directed Courville to test and ascertain privileged information from Speights. Courville is an intelligent business professional, who was highly incentivized to follow the Prosecution Team's orders to extract information from Speights. And in fact, Courville was highly successful in doing so, as reflected in his acquisition of not only Speights's recollections regarding his legal advice from McKenna and Dugger's representation of the five individuals operating TCL, but also Courville's acquisition of a same-day email from Speights's counsel regarding his real-time legal defense, even over Speights's expressed reservations. The Government's position must then be that Courville repeatedly defied their direct guidance and advice when he, over a period of months, forayed over and over into matters that obviously implicate privilege concerns. However,

at the very least Courville's uniquely successful returns allude to the nature of the instructions he actually received from the Prosecution Team.

Further, the timeline of events in the records strongly indicate that the Prosecution Team directed Courville from the very beginning to elicit from Speights the legal advice that would underpin his advice of counsel defense, long before Speights ever even had the opportunity to evaluate and decide whether to assert an advice of counsel defense. For example, on February 14, 2021, just three days after being purportedly told to not discuss attorney-client communications, Courville records a call with Speights in which, among other things, he directly solicits privileged material relating to the lawyers advising TCL. Courville asked Speights if McKenna and Dugger are standing behind the legal advice they provided to TCL.[112] Courville asked about details including who attended and what was said by McKenna in connection with a meeting with a marketing company.[113] The Government has offered no explanation for his overt effort to elicit attorney conversations just three days after allegedly being admonished to do exactly the opposite.

The Government's position must be that Courville again made the same error within an hour of receiving the admonishment on April 28, 2021. That day, TFO Wood's Investigation Documentation Form indicates that Courville met with TFO Wood and Trial Attorney López "at approximately 5:22 PM" in order to prepare for the undercover dinner meeting with Speights.[114]

---

[112] Ex. H (Apr. 14, 2021 Transcript), at [00:03:57-00:04:08] ("MR. COURVILLE: Keith? But is McKenna's sticking -- like -- I've heard mixed things. Like -- is McKenna sticking by with what he said or not?").

[113] *Id*. at [00:16:39-00:16:57] ("MR. COURVILLE: That was -- that was -- that was with -- I think -- was Rob there? Because I wasn't there. MR. SPEIGHTS: Rob was in that meeting -- Rob was in that meeting. MR. COURVILLE: Okay. You weren't there, though, were you? MR. SPEIGHTS: I was there, but I was not in that meeting.").

[114] Ex. E (Investigation Documentation Form (04/28/2021 – 05/11/2021)), at 1.

While TFO Wood's form does not reflect any instruction to avoid privileged information at that time, the 2023 Filter Team Letter claims that during the meeting Trial Attorney López "verbally admonished the CHS in person not to elicit privilege communication, and if they arose, to steer the conversation away from such communications."[115]  Less than an hour later, Courville asked to see an email from counsel for Speights and is asked to keep his knowledge of the email confidential.[116]  In fact, when Speights expresses a desire to move away from his counsel's email, Courville encourages him to keep going so that he can learn more:

> [00:17:55] MR. SPEIGHTS:    I can't answer these fucking questions tonight.  Let me call [Inaudible]
>
> [00:18:00] MR. COURVILLE: Shit -- we can answer right now.  Shit -- let's knock it out.
>
> [00:18:03] MR. SPEIGHTS:    Huh?
>
> [00:18:03] MR. COURVILLE: Let's knock it out.[117]

Throughout that meeting, Courville also elicited privileged communications related to Dugger's and McKenna's legal opinions regarding TCL's largest marketer,[118] the same with respect to a marketer from New Jersey,[119] and whether Dugger and McKenna will stand behind their legal advice.[120]  If Courville was admonished to stay away from privilege communications, he again defied the Government's instructions less than an hour later.  Courville reviewed an email from Speights' counsel, used the contents of that email as an outline for the conversation, asked

---

[115] Joint Status Report, Ex. B (ECF Doc. No. 120-2), at 4.
[116] Ex. F (Apr. 28, 2021 Transcript), at [00:11:11-00:11:21] ("MR. SPEIGHTS: So -- this email is from Bethanie, that's Gene's associate.  You won't tell anybody I'm showing this to you, will you? MR. COURVILLE: No.").
[117] Ex. G (Apr. 28, 2021 Transcript), at [00:15:55-00:18:03].
[118] Ex. M (Apr. 28, 2021 Transcript), at [00:11:38-00:12:05].
[119] Ex. I (Apr. 28, 2021 Transcript), at [00:40:38-00:40:59].
[120] *Id.* at [00:42:19-00:42:40].

about TCL's lawyers and their advice, and clearly waded waist deep into potentially privileged waters within literally minutes of allegedly being instructed otherwise.    Speights believes an evidentiary hearing would reveal that the Prosecution Team instructed Courville to ascertain information about the intersection of legal advice and TCL's marketers, and that the Prosecution Team did not give him overt, clear instructions to avoid attorney-client communications.

The timeline of events on April 20, 2021 is especially troubling because the contemporary record clearly reflects the Prosecution Team's instruction to Courville to ascertain what, if anything, McKenna and Dugger understood about TCL's contracts with various marketers and what advice the five individuals operating TCL received from their counsel.  On April 20, 2021, Trial Attorney López organized a meeting between TFO Wood, Trial Attorney López, Barret Howell, and Courville.[121]  At that meeting, TFO Wood provided Courville with a new recording device[122] and instructed Courville regarding the topics that Courville should record Speights discussing.[123]  TFO Wood's Investigation Documentation Form makes clear that the Prosecution Team directed "what should be discussed with Speights."[124]  TFO Wood also instructed Courville "how to brief each recorded conversation."[125]

That same day—only hours after meeting with the Prosecution Team—Courville records another phone call with Speights and less than two minutes into the conversation Courville begins asking Speights what the attorneys knew about certain marketing contracts:[126]

---

[121] Ex. D (López Texts with Howell).
[122] The old one was collected by Special Agent Shaw on 3/25/21.
[123] Ex. B (Investigation Documentation Form (04/20/2021 – 05/11/2021)), at 1.
[124] *Id.*
[125] *Id.*
[126] Ex. C (Apr. 20, 2021 Transcript).

[01:51:000] MR. COURVILLE: He's like, did the attorneys know that, y'all, like, is that the contracts that Grisham, that we signed, that Grisham signed from Hall Render,

[02:06:000] MR. COURVILLE: and that we decided to pay a different way, or did they know that we were paying a percentage?

[02:14:000] MR. SPEIGHTS: Man, I can't answer that. I mean, I'm assuming they knew we were paying the exact way we were paying.

[02:21:000] MR. COURVILLE: Okay.

[02:22:000] MR. SPEIGHTS: I mean, we did anything the lawyers didn't tell us not to do, I don't know that. I mean, I really don't.

[02:27:000] MR. COURVILLE: Right, right. I just –[127]

Minutes later in the same conversation, Courville questions Speights about whether McKenna and Dugger will stand behind the legal advice and guidance they have provided with respect to TCL:

[11:38:000] MR. COURVILLE: I mean, but you think Hall Render is going to--

[11:39:000] MR. COURVILLE: I mean, we're going to sue them, but you think they're going to stand by everything?

[11:42.000] MR. SPEIGHTS: Last I heard, and that was months ago, but they were standing by everything that they

[11:46.000] MR. SPEIGHTS: advised us on.

[11:47:000] MR. COURVILLE: And what about Sean?

[11:48:000] MR. SPEIGHTS: I don't know about McKenna.[128]

The only explanation for these direct lines of questioning immediately after Courville met with the Prosecution Team regarding "what should be discussed with Speights" is that Courville was following the express instructions of the Prosecution Team with respect to the topics he pursued with Speights.

---

[127] *Id*. at [00:01:51-00:02:27].
[128] *Id*. at [00:11:38-00:11:48].

57

In fact, TFO Wood's Activity Log reflects that the Prosecution Team was immediately aware of the fruits of their intentional covert foray into privileged material because TFO Wood "spoke on phone with confidential source after phone calls." [129]  This also seemed to trigger a flurry of activity occurs within the Prosecution Team, as TFO Wood and Trial Attorney López learn about the contents and developments of the call with Speights.  For example, throughout that day and evening of April 20, 2021, Trial Attorney López sent five text messages to Courville's attorney, all indicating that he was eager to connect with Courville's counsel.[130]

Taken all together, the records produced by the Filter Team indicate that the Prosecution Team understood the largest impediment to prosecuting this case was the Defendants' reliance upon legal advice from McKenna and Dugger.  In order to cut down the reliance of counsel defense before the Defendants even had the opportunity to evaluate and assert the defense, the Prosecution Team directed Courville—who surely knows how to follow directions to at least some degree—to obtain privileged information including, but not limited to:

- What did the lawyers know about certain marketing arrangements;
- Which marketers were vetted by counsel;
- Whether or not the lawyers would stand behind their legal advice; and
- Speights's counsel's strategy and compilation of key players and topics in the investigation.

Perhaps more importantly, the Prosecution Team had a covert window into the defense camp and obtained information about the attorney-client relationship it would have never been entitled to prior to indictment.  The Prosecution Team used and relied upon the information it tactically

---

[129] Wood Activity Log (ECF Doc. No. 121-5), at 2.

[130] Ex. D (López Texts with Howell), at 36-38 (Trial Attorney López texting at 12:27 PM: "Call you back?" and "Just tried you.  Call me when you're free.  Yes 2pm.", then at 6:58 PM: "We're we suppose to talk?", then at 8:40 PM: "If you're up please call me." and "Of course, I'll be up working.").

obtained as it charted the future covert course of its investigation, indictment, and prosecution. The effort to extract privileged information that could be leveraged to undermine and/or work around legal advice was intentionally directed by the Prosecution Team to gain a strategic advantage in this investigation, and the Prosecution Team succeeded.

### 3. *Prosecution Team Prejudiced Speights Through Its Reliance Upon Potentially Privileged Materials*

While the Court can, and should, presume prejudice in this case, the contents of the Prosecution memorandum and other documents produced by the Filter Team clearly shows actual and substantial prejudice in the present case. As some courts have noted, governmental possession of attorney-client privileged "information is inherently detrimental, unfairly advantages the prosecution, and threatens to subvert the adversary system of criminal justice." *United States v. Mastroianni*, 749 F.2d 900, 907-08 (1st Cir. 1984) (citing *Weatherford v. Bursey,* 429 U.S. 545 at 556 (1977)). Accordingly, where intentional, wrongful intrusion into a defendant's attorney-client relationships results in the prosecution obtaining the defendant's trial strategy, several courts, including the Fifth Circuit, have presumed prejudice. *See Guild v. Securus Techs., Inc.*, No. 1:14-CV-366-LY, 2015 WL 10818584, at *13 (W.D. Tex. Feb. 4, 2015), report and recommendation adopted sub nom. A*ustin Lawyers Guild v. Securus Techs., Inc.*, No. 1:14-CV-366-LY, 2015 WL 11237655 (W.D. Tex. Mar. 23, 2015) (citing *United States v. Zarzour* , 432 F.2d 1, 2 (5th Cir. 1970)); *see also, e.g., Shillinger v. Haworth*, 70 F.3d 1132, 1141 (10th Cir. 1995) (citing *Strickland,* 466 U.S. at 692, 104 S.Ct. at 2067) ("At the same time, however, in certain Sixth Amendment contexts, prejudice is presumed. This is particularly true with regard to various kinds of state interference with counsel's assistance."); *Perry v. Leeke,* 488 U.S. 272, 279–80, 109 S.Ct. 594, 599, 102 L.Ed.2d 624 (1989) (stating that the Supreme Court has "expressly noted that direct

governmental interference with the right to counsel is a different matter" with regard to whether prejudice must be shown, and collecting representative cases where prejudice need not be proved); *United States v. Cronic,* 466 U.S. 648, 658 n.24, 104 S.Ct. 2039, 2046, 80 L.Ed.2d 657 (1984) (citing cases in which the Court has discussed circumstances justifying a presumption of prejudice).

The circumstances reflecting prejudice in this case are unique. The same Prosecution Team that gathered evidence by infringing on Speights's attorney-client privilege is still currently prosecuting the case. No separate filter team was engaged at any point until Speights became aware of this issue in 2023. *Contra Woodruff v. Davis*, No. 3:15-CV-1832-M, 2017 WL 5897534, at *3 (N.D. Tex. Nov. 30, 2017) (Lynn, J.) (finding that any due process error regarding the defendant's work-product claim harmless because the evidence obtained from the recordings was suppressed, a special prosecutor was appointed, and the communication between the special prosecutor and the DA's Office about the case was barred).

Prosecution Team also plainly used the improperly gathered evidence to indict Speights. Although the Government now claims that the evidence gathered through these meetings with Courville will not be used at the trial, "the fruit of the prosecutor's transgression is the indictment itself." *See United States v. Marshank*, 777 F. Supp. 1507, 1522 (N.D. Cal. 1991). The Government's recent position that the recordings "did not inform any subsequent investigative action taken by the Prosecution Team"[131] facially conflicts with the fact that the Prosecution memorandum contains an entire section related to the recordings. In fact, the Prosecution Team felt so confident in the results of their early intrusion into Speights's attorney-client relationships

---

[131] Joint Status Report, Ex. B (ECF Doc. No. 120-2), at 7.

that the Prosecution memorandum includes allegations to negate the not-yet-asserted advice of counsel defense and an assertion that "the prosecution team will file a crime-fraud motion and/or a motion to compel discovery related to an advice-of-counsel defense to further examine these topics within approximately 45 days."[132]

Here, Courville, at the instruction of the Prosecution Team, not only gained access to privileged communications, but also inserted himself into the relationship between Speights and his attorney by offering to and drafting the response to the attorney's email together with Speights. By doing so, Courville and the Prosecution Team gained access to confidential defense planning. *See United States v. Posner*, 637 F. Supp. 456, 459-60 (S.D. Fla. 1986) (the use of informants to infiltrate the defense camp is just the sort of "glaring government intrusion" that "warrant[s] court intervention.").

The Court should find that Speights has been prejudiced by the Prosecution Team's misconduct.  If necessary, the Court should schedule an evidentiary hearing to question members of the Prosecution Team in order to fully resolve any uncertain factual issues.  *See United States v. Voigt*, 89 F.3d 1050, 1067 (3d Cir. 1996) (holding that the district court should have conducted an evidentiary hearing regarding a "claim of outrageousness pertaining to alleged governmental intrusion into the attorney-client relationship").

### 4. *Government's Intentional Invasion Into Speights's Attorney-Client Relationships Warrants Dismissal of the Indictment or at Least Replacement of the Prosecution Team*

A Court may dismiss an indictment with prejudice when "the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from

---

[132] Prosecution Memo (ECF Doc. No. 121-7), at 14.

invoking judicial processes to obtain a conviction." *United States v. Russell*, 411 U.S. 423, 93 S.Ct.

1637, 36 L.Ed.2d 366 (1973).  Notably, the Fifth Circuit's holding in *Fulmer* also suggests that

even in situations that do not warrant dismissal with prejudice, a defendant may still be entitled to

dismissal of the indictment without prejudice.  *See United States v. Fulmer*, 722 F.2d 1192, 1196

(5th Cir. 1983) (affirming dismissal of the indictment and holding that "while Fulmer is entitled

to a dismissal of the indictment, he is not entitled to permanent immunity respecting his alleged

criminal conduct" because the governmental carelessness in that case was not "so abhorrent as to

warrant a dismissal with prejudice").

Where a prosecutor so subverts a defendant's relationship with his attorney as to constitute

a violation of the defendant's constitutional rights, such violation may give rise to dismissal of the

indictment under the Fifth and Sixth Amendments.  *See United States v. Hungerford*, No. CR 18-

112, 2019 WL 1903212, at *10 (E.D. La. Apr. 29, 2019).

Further, a prosecutor that has engaged in misconduct prejudicial to the administration of

justice should be disqualified.  Prosecutors carry a unique burden in our justice system—they serve

not simply as advocates, but as representatives of a sovereign with the duty to ensure all defendants

are accorded procedural justice.  *See United States v. Beaulieu*, 973 F.3d 354, 362 (5th Cir. 2020)

(A prosecutor's "duty is not to 'win a case,' but to ensure 'that justice shall be done.'") (internal

citations omitted). "[A]t the very least, the prosecutor and police have an affirmative obligation

not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to

counsel." *Maine v. Moulton*, 474 U.S. 159, 171 (1985).  Courts have often offered the Government

wide latitude in retaining its counsel of choice.  *See United States v. Bolden*, 353 F.3d 870, 878–

79 (10th Cir. 2003) (noting that circumstances in which government counsel have been

disqualified are "limited"). But, where clear and convincing evidence of prosecutorial misconduct causes the "defendant's right to a fair trial free from improper prosecutorial motives" and the "court's interest in protecting the integrity of the proceedings and maintaining public confidence in the judicial system" to outweigh the government's interest in retaining its counsel, such counsel should be dismissed. *See United States v. Kahre,* 737 F.3d 554, 574 (9th Cir. 2013); *United States v. Vega*, 317 F. Supp. 2d 599, 602–03 (D.V.I. 2004); *United States v. Cox*, No. CRIM. 11-99 JLL, 2012 WL 1986534, at *6 (D.N.J. June 4, 2012). Courts have found prejudice where, for example, bona fide allegations of bad faith performance of official duties by government counsel exist in a civil case, where the prosecutor has a conflict of interest, where a prosecutor is exposed to immunized testimony, and where a prosecutor listens to recorded phone calls between a defendant and his lawyer. *See United States v. Heldt,* 668 F.2d 1238, 1275 (D.C.Cir.1981); *Young v. United States,* 481 U.S. 787, 807, 107 S.Ct. 2124, 95 L.Ed.2d 740 (1987); *United States v. Prantil,* 764 F.2d 548, 552–53 (9th Cir. 1985); *United States v. Daniels*, 281 F.3d 168, 182 (5th Cir. 2002) (Sixth Amendment context); *Woodruff v. Davis*, No. 3:15-CV-1832-M, 2017 WL 5897534, at *3 (N.D. Tex. Nov. 30, 2017). The Government has also engaged in prejudicial misconduct where it has improperly gained an "insight into defense tactics, strategy, and problems." *See United States v. Horn*, 811 F. Supp. 739, 751 (D.N.H. 1992), rev'd in part, 29 F.3d 754 (1st Cir. 1994) (rev'd in part on other grounds) (Sixth Amendment context). Where actual prejudice exists, the proper remedy is to remove the prosecutor at issue. *See, e.g., Crocker v. Durkin*, 159 F. Supp. 2d 1258, 1284–85 (D. Kan. 2001); *United States v. Lorenzo*, 995 F.2d 1448, 1453 (9th Cir. 1993).

The circumstances in this case are egregious. Through Courville, the Prosecution Team deliberately sought Speights's privileged information in order to subvert Speights's attorney-client

relationships early enough to quash any advice of counsel defense he may have before Speights even had the opportunity to assert it. Troublingly, the Prosecution Team did so after seeking ethical advice regarding the engagement of Courville. The Prosecution Team knew to be cautious about privilege disclosures from the very beginning. Nevertheless, the Prosecution Team never sought to include a filter team in its process. Based on the records, it seems the Prosecution Team's decision to not include a filter team was deliberate in order to further their ability to access the defense camp via Courville.

Given the outrageous misconduct by the Prosecution Team, the Court should dismiss the indictment against Speights either with or without prejudice. At the very least, the Court should order that the Prosecution Team be removed from this case and replaced by a new team of prosecutors who have not been tainted by access to the privileged information in the undercover recordings.

## IV.    CONCLUSION

As set forth above, the Prosecution Team's deliberate and intentional conduct has been so outrageous that it shocks all sense of justice. The Prosecution Team successfully acquired recordings that reflect the above-specified attorney-client privileged information and work-product materials. The Prosecution Team wrongfully acquired those protected materials by instructing Courville as a confidential source to elicit from Speights the contents of the legal advice that would underpin any advice of counsel defense before Speights even had the opportunity to evaluate or assert such a defense. The Prosecution Team failed to engage a filter team at any appropriate stage to review the recordings for protected information, even though the Prosecution Team knew about the potentially privileged materials and had an obligation to "not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel." *See*

*Maine v. Moulton*, 474 U.S. 159, 171 (1985).  Instead, the Prosecution Team acted to prejudice Speights by possessing the privileged information for years and affirmatively using it to indict Speights, to subvert Speights's relationships with his attorneys, and to preemptively block Speights from relying on advice of counsel.

Surely the Prosecution Team knew that it never had the right to unilaterally force Speights to assert an advice of counsel defense and thereby waive Speights's privilege over communications that the Prosecution Team believed would be relevant to such a defense.

Accordingly, Speights asks that the Court find that the Prosecution Team violated Speights's Fifth Amendment and Sixth Amendment rights.  As a result of these violations, Speights asks that the Court issue an order dismissing the Superseding Indictment as to Speights and disqualifying the Prosecution Team from further involvement in the prosecution or investigation of this case.

WHEREFORE, PREMISES CONSIDERED, Speights respectfully requests that the instant motion be, in all things, granted, and that the Court disqualify the Prosecution Team and dismiss the Superseding Indictment with prejudice as to Defendant Speights.

Dated:  May 3, 2023

Respectfully submitted,

By: */s/ Gene R. Besen*
    GENE R. BESEN
    Email: gbesen@bradley.com
    ELISHA J. KOBRE
    Email: ekobre@bradley.com
    LANE M. WEBSTER
    Email: lwebster@bradley.com

BRADLEY ARANT BOULT CUMMINGS LLP
1445 Ross Avenue, Suite 3600
Dallas, Texas 75202
Telephone (214) 257-9800
Facsimile (214) 939-8787

65

ATTORNEYS FOR RIC SPEIGHTS, JR.